[No. B162003. Second Dist., Div. Five. Aug. 15, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
WILFORT FOSTER, Defendant and Appellant.

### COUNSEL

Randy S. Kravis, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Mary Sanchez and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

### OPINION

## INTRODUCTION

**MOSK, J.**—Defendant and appellant Wilfort Foster appeals from a judgment sentencing him to a term of two years in prison after a jury found him guilty of burglary and grand theft. ■ Defendant contends on appeal that (1) the prosecutor committed misconduct during his cross-examination of defendant by repeatedly asking defendant whether other witnesses had lied during their testimony, and (2) defendant's trial counsel rendered ineffective assistance by failing to object to those questions by the prosecutor. Although there are competing lines of cases regarding whether such questions are *improper, we do not need to* resolve that issue because we hold that defendant failed to show that his counsel rendered ineffective assistance and that defendant suffered prejudice. Accordingly, we affirm the judgment.

## BACKGROUND

Exide Technologies (Exide), a company that manufactures and sells batteries for transportation and industrial purposes, has a distribution center in the City of Industry, California. The distribution center consists of offices and a warehouse surrounded by a fence. The warehouse has a long row of loading docks to facilitate the loading of batteries onto trucks. The trucks are operated by a third party carrier, Transservice, which had an exclusive contract to provide all the transportation for Exide products. All the trucks Transservice used were labeled with Transservice's insignia, and all the trailers that carried

Exide's products were labeled "Exide" or "G & B." Transservice did not use Budget rental trucks at any time.

There were two entrances to the Exide distribution center. There was a front gate that was guarded by a security guard and a back entrance that was secured with a locked chain. Only two or three people had a key to the lock on that chain; the security guard was not one of them. There was a security camera focused on the area around the front gate. The images from that camera were recorded on a 30-hour videotape. The videotape recorder, which was supposed to operate continuously, was in the file room in the front office at the distribution center.

On May 27, 2002, there were very few people at the distribution center (and no one in the warehouse) because it was a holiday for Exide employees. Ron Campos (Campos), who was the transportation manager for Transservice, worked from 7:00 a.m. to 3:00 p.m. that day, because there were trucks departing from the facility. He walked up and down the loading docks that day, and at no time did he see a Budget rental truck. When he left at 3:00 p.m., all the doors in the loading docks were closed and the back entrance was secure.

Corina Batrez (Batrez) worked as a security guard at the distribution center, and worked from 8:00 a.m. until 4:00 p.m. that day. She made security checks every two hours to make sure that all the doors to the loading docks were closed. She never saw a Budget rental truck at the distribution center that day. She also replaced the videotape for the security system at 1:00 p.m. as part of her normal duties.

Defendant also worked as a security guard at the distribution center, and began his shift at 4:00 p.m. that day. When he arrived for work, he spoke with Batrez and then went with her into the front office to drop off her paperwork for the day. As she was leaving at the end of her shift, defendant told her that he was going to put his lunch in the refrigerator in the office, and she saw him walk toward the office. The security videotape shows defendant arriving and going into the security shack at the front gate and walking with Batrez toward the office. It also shows defendant walking back to the shack with Batrez, Batrez leaving, and defendant walking back toward the office. The tape ended a few minutes later.

At approximately 5:45 p.m., Gary Womble (Womble), the general manager for the distribution center, drove up to the front gate. Womble, who was with his wife, intended to drive around the facility to make sure it was secure and then go to his office to obtain information he needed to do some work that evening. Defendant was in the guard shack when Womble arrived. Womble

asked defendant to open the gate and to open the front office while Womble drove around the facility. When defendant hesitated, Womble asked him again. Defendant took the front office key off his key ring and handed it to Womble, but defendant did not open the gate. Womble asked him again to open the gate, but again defendant hesitated until Womble asked him for the fourth time, at which time defendant complied.

Womble drove into the parking lot and past the loading docks. He was looking at the trailers on his left, and his wife was looking at the loading docks on the right. His wife noticed a Budget rental truck backed into loading dock no. 23 and asked him about it. He looked to the right and saw that the door to dock no. 23 was open about two to three feet. He saw part of a face looking through the open door.

Because he knew there were no Exide employees working that day, he knew that something was wrong. He drove back to the front gate, got out of his car and yelled at defendant to call 911 because the facility was being robbed. When defendant did not make the call immediately, Womble's wife called 911 on her cell phone. While his wife was making the call, Womble saw two people exit the warehouse through a side door and run away.

When deputies from the Los Angeles Sheriff's Department arrived, they searched the distribution center with Womble. Among other things, they found that the Budget rental truck was loaded with Exide batteries worth just under $18,000 wholesale (or approximately $54,000 retail). Womble also found that the videotape in the video recorder for the security camera had been ejected. According to a maintenance mechanic for Exide, the recorder does not eject the videotape unless someone pushes the eject button.

Defendant was arrested and charged by information with two counts: burglary, a violation of Penal Code section 459, and grand theft of personal property, a violation of Penal Code section 487, subdivision (a). The jury found him guilty of both counts. The trial court sentenced him to the middle term of two years on the burglary count and stayed imposition of sentence on the grand theft count in accordance with Penal Code section 654. Defendant filed a timely appeal from the judgment.

## DISCUSSION

Defendant contends on appeal that the prosecutor committed misconduct by asking defendant during cross-examination whether certain prosecution witnesses had lied during their testimony. For example, Womble testified that he, Womble, had raised his voice when defendant failed to comply with Womble's request to open the front gate and that defendant took the key to

the front office off his key chain and handed it to Womble rather than open the front gate. Defendant denied those facts in his direct examination. During defendant's cross-examination, the prosecutor asked defendant whether Womble had been lying when he gave that testimony. The prosecutor also asked defendant whether Campos and Batrez were lying when they testified that there was no Budget rental truck at the distribution center before defendant came on duty. The prosecutor asked whether Batrez was lying when she testified that the front gate was locked and that she was on duty in the guard shack from 3:00 p.m. (when Campos left) until defendant came on duty. Finally, the prosecutor asked whether the deputy sheriffs lied when they testified that defendant did not assist in the search of the property and that defendant told one of them that he, defendant, had bone cancer.

Defendant concedes that his counsel did not object to these questions. Therefore, "[w]e need not address [defendant's contention] on the merits because defense counsel's failure to object to the prosecutor's [questions] waives the issue on appeal." (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1125 [36 Cal.Rptr.2d 235, 885 P.2d 1]; see also *People v. Gionis* (1995) 9 Cal.4th 1196, 1215 [40 Cal.Rptr.2d 456, 892 P.2d 1199] [" 'To preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct' "].) In any event, as discussed below, defendant failed to show that he was harmed by the prosecutor's conduct.

Defendant argues, however, that his attorney's failure to object to the prosecutor's questions about whether others lied constituted ineffective assistance of counsel. "Generally, a conviction will not be reversed based on a claim of ineffective assistance of counsel unless the defendant establishes *both* of the following: (1) that counsel's representation fell below an objective standard of reasonableness; *and* (2) that there is a reasonable probability that, but for counsel's unprofessional errors, a determination more favorable to defendant would have resulted. [Citations.] If the defendant makes an insufficient showing on either one of these components, the ineffective assistance claim fails." (*People v. Rodrigues, supra*, 8 Cal.4th at p. 1126; see also *People v. Cunningham* (2001) 25 Cal.4th 926, 1003 [108 Cal.Rptr.2d 291, 25 P.3d 519] [explaining that first component is established by demonstrating "that counsel's performance did not meet the standard to be expected of a reasonably competent attorney"].) In the present case, defendant's showing was inadequate as to both components.

The issue of whether it is misconduct for a prosecutor to ask a defendant on cross-examination whether another witness was lying has not been addressed in a published decision by any California court. Courts from other jurisdictions that have addressed the issue have reached varying conclusions.

One line of cases holds that asking "were they lying" questions is always misconduct. (See, e.g., *United States v. Sanchez* (9th Cir. 1999) 176 F.3d 1214; *United States v. Sullivan* (1st Cir. 1996) 85 F.3d 743; *United States v. Boyd* (D.C. Cir. 1995) 312 U.S. App. D.C. 35 [54 F.3d 868]; *United States v. Richter* (2d Cir. 1987) 826 F.2d 206; *Scott v. United States* (D.C.App. 1993) 619 A.2d 917; *State v. Flanagan* (N.M.App. 1990) 111 N.M. 93 [801 P.2d 675]; *State v. Casteneda-Perez* (Wash.App. 1990) 61 Wn.App. 354 [810 P.2d 74].) The courts in these cases explain that these questions infringe on the jury's right to make credibility determinations (see, e.g., *Sanchez*, at pp. 1219–1220; *Sullivan*, at pp. 749–750; *Boyd*, at p. 871; *Flanagan*, at p. 679; *Casteneda-Perez*, at p. 78), or that the questions are misleading because they suggest that the only explanation for the discrepancy between defendant's testimony and the other witness' testimony is that one of them is lying (see, e.g., *Richter*, at p. 209; *Flanagan*, at p. 679; *Casteneda-Perez*, at p. 79). Moreover, the questions might be considered misleading or calling for a conclusion in that they suggest that the defendant can know what another witness was thinking.

Another line of cases holds that asking "were they lying" questions is not misconduct. (See, e.g., *Whatley v. State* (Ga. 1998) 270 Ga. 296 [509 S.E.2d 45]; *Fisher v. State* (Md.App. 1999) 128 Md.App. 79 [736 A.2d 1125] (*Fisher*).) The courts in these cases explain that these questions " ' "merely emphasize[] the conflict in the evidence, which it was the jury's duty to resolve." ' " (*Whatley*, at p. 51.) As the court in *Fisher* stated: "It is a commonplace that the ultimate goal of successful cross-examination, albeit a goal seldom realized, is to expose an adverse witness as a liar ... [¶] One way to expose falsehood is to highlight, as dramatically as possible, the number of witnesses, ideally neutral witnesses with no reason to fabricate, who have given contradictory accounts." (*Fisher*, at p. 1162.) The *Fisher* court rejected the defendant's argument that "were they lying" questions are improper under case law that prohibits asking an expert witness to assess the credibility of a testifying witness, explaining that "that [case law] has nothing to do with challenging the veracity of a testifying eyewitness by demanding an explanation of why other witnesses have given contradictory accounts. [¶] What is said in a larger sense is not necessarily the same as what is literally said in so many words. Regardless of what literal words were spoken, [the witness] was not being asked to assess the credibility of those who had given different accounts of events. The only credibility in issue was her own. What [the witness] was being asked to do was either 1) to acknowledge her own falsity or 2) to look foolish in denying it. Once the final rhetorical question 'So all these people are lying but [the witness]?' was asked, the skillful cross-examiner would have been turning and walking disdainfully away without waiting for an answer. The answer no longer mattered." (*Id.* at p. 1163, fns. omitted.)

A third line of cases holds that "were they lying" questions are neither categorically improper nor categorically proper, but are proper under certain limited circumstances. (See, e.g., *State v. Morales* (Ariz.App. 2000) 198 Ariz. 372 [10 P.3d 630] ; *State v. Pilot* (Minn. 1999) 595 N.W.2d 511; *State v. Hart* (Mont. 2000) 2000 MT 332 [15 P.3d 917, 303 Mont. 71]; *People v. Overlee* (N.Y.App. Div. 1997) 236 A.D.2d 133 [666 N.Y.S.2d 572].) The courts in these cases held that these questions may be appropriate when the only possible explanation for the defendant's inconsistent testimony is that either the defendant or the other witness is lying (see, e.g., *Morales*, at p. 633; *Pilot*, at p. 517; *Hart*, at p. 924; *Overlee*, at p. 576), or when the defendant has opened the door during direct examination by testifying about the veracity of other witnesses (see, e.g., *Morales*, at p. 633; *Pilot*, at p. 518; *Hart*, at p. 924; *Overlee*, at p. 577), or when the "were they lying" questions "have a probative value in clarifying a particular line of testimony" (*Pilot*, at p. 518; see also *Hart*, at p. 924).

We need not decide for the purposes of this appeal which, if any, of these lines of cases should apply in California because regardless of the propriety of the prosecutor's questions, defendant failed to establish either component necessary for a reversal based on ineffective assistance of counsel under *People v. Rodrigues, supra,* 8 Cal.4th at page 1126. Given that there is no California authority establishing whether or not the questions were proper, defendant cannot establish that counsel's failure to object to the prosecutor's questions in this case "fell below an objective standard of reasonableness." (*Ibid.*; see also *Smith v. Lewis* (1975) 13 Cal.3d 349, 358 [118 Cal.Rptr. 621, 530 P.2d 589] ["If the law on a particular subject is doubtful or debatable, an attorney will not be held responsible for failing to anticipate the manner in which the uncertainty will be resolved"].) Moreover, it is not reasonably probable that "a determination more favorable to defendant would have resulted" if the questions had not been asked. (*People v. Rodrigues, supra,* 8 Cal.4th at p. 1126.) The evidence was overwhelming that the Budget rental truck did not enter the distribution center before defendant came on duty, and that the truck could not have entered, taken a position at the loading dock, and been loaded with Exide batteries without defendant's knowledge and assistance. Therefore, the judgment must be affirmed.

## DISPOSITION

The judgment is affirmed.

Grignon, Acting P. J., and Armstrong, J., concurred.

Appellant's petition for review by the Supreme Court was denied November 12, 2003.