Filed 5/28/21  P. v. Hernandez CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>JESUS ANTONIO HERNANDEZ,<br><br>　　　Defendant and Appellant. | B302875<br><br>(Los Angeles County<br>Super. Ct. No. VA148212) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Raul Anthony Sahagun, Judge.  Modified and affirmed with directions.

Stanley Dale Radtke, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Matthew Rodriquez, Acting Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, Colleen M. Tiedemann and Rene Judkiewicz, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Jesus Antonio Hernandez was charged with an assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1),[1] namely a car, on Susan Enciso (Susan), second degree burglary (§ 459), and felony vandalism (§ 594, subd. (a)). The burglary charge was dismissed when the trial began.

A jury found appellant not guilty of assault but guilty of felony vandalism. On November 14, 2019, the imposition of the sentence was suspended and appellant was placed on probation for five years on the condition he serve 365 days in county jail. He received credit for 34 days in custody. Various fines and fees were imposed, which are not challenged on appeal. The appeal is from the order granting probation, which is deemed a final judgment for the purposes of the appeal. (§ 1237, subd. (a).)

We reject appellant's contentions that the prosecutor committed misconduct, that his counsel was ineffective, and that the evidence does not support the conviction. However, we agree with the claim propounded in appellant's supplemental brief that Assembly Bill No. 1950 (2019–2020 Reg. Sess.) (AB 1950), which amended section 1203.1 effective January 1, 2021, to provide that the probationary period shall be two years, applies to appellant's case. We reduce the probationary period from five to two years and otherwise affirm the judgment.

**FACTS**

### 1. The People's Case

Appellant was employed as a forklift operator by Custom Goods in Carson. On Friday, July 13, 2018, around 10 a.m., he entered the Nexem Staffing (Nexem) office at 4100 South Street in Lakewood. Nexem is an employment agency which recruits

---

[1] Statutory references are to the Penal Code.

workers for employers.  The two Nexem employees present when appellant entered the office were Susan, a recruiter, and Y.G., the branch manager.

Appellant walked up to Y.G., who was at the office counter. Appellant appeared to be upset.  He asked for his paycheck without engaging in any preliminaries.  Y.G. asked for his identification in order to check if they had his check in the office. If any of Nexem's "associates" (meaning employees) are not going to their place of work on Friday, their paycheck will be held at Nexem.  Y.G. called appellant's job site and learned that appellant's check was at his job site.  Y.G. was told that appellant was supposed to report for work but had not showed up. According to Y.G., appellant's job site in Carson is about 25 minutes of driving time from the Nexem office in Lakewood.

Y.G. told appellant that his check was not at Nexem but was at the job site.  She told appellant he had two choices.  He could go to the work site and pick up his check there or he could wait until Monday to pick up the check at Nexem, in which case the check would have to be redelivered to Nexem that evening since Y.G. could not leave the office.

Y.G. could tell from his body language and tone of voice that appellant had become more upset.  He told Y.G. that he needed his "f***" check.  Y.G. repeated that since he was supposed to be at work today, his check had been sent there.  Appellant said he didn't want to go back to the work site because he was going to get fired "anyway."  Appellant left the Nexem office.  As he left, he said, "I see how you people are."  Y.G. watched appellant walk to his car and get inside.  She returned to her desk.  Y.G. remarked to Susan that appellant "looked kind of upset."

Appellant returned in about 15 minutes.  According to Susan, he was now really upset and he also seemed very frustrated.  Y.G. asked him what happened and he said they didn't have his "F*** check."  Y.G. said, "So you're, like, telling me that you went all the way to Carson in ten, 15 minutes, then came back?"  Appellant replied, "Yeah. Give me my f*** check."  Y.G. repeated the two options that appellant had.  Appellant said, "F*** you people.  I want corporate's number."  Y.G. gave him the number.  Appellant walked out with a smirk on his face.

Y.G. saw appellant getting into his car, which was a white Pontiac minivan.  She started walking back to her desk when she heard the screech of tires.  She saw "his taillights blowing through the window."  Appellant's car hit the printer which was by the window.[2]  The rear of the car entered the building to a depth of approximately two feet.  The impact of the vehicle smashed two large windows and damaged a beam inside the office.  Debris from the vehicle was left inside the building, including a taillight from the car.  After the impact, appellant "just drove off."  The damages amounted to $9,550.

As appellant was driving away, Y.G. called 911.  While Y.G. was on the 911 call, a man from the business across the street ran into the Nexem office and said he had witnessed the whole incident.  He had taken a video of it which he showed Y.G.

Sergeant Leon Reynolds of the Los Angeles County Sheriff's Department responded to the 911 call.  He inspected the damage to the premises and interviewed Y.G. and Susan.  He obtained the minivan's license plate number from the video.  The video also showed appellant, whom both Y.G. and Susan

_____

[2] The printer was large.  It was estimated to weigh 1,500 pounds.

identified as the person who had been in the Nexem office. Reynolds obtained appellant's name and address from the Department of Motor Vehicles. He drove to appellant's residence, which was in a trailer park.

Reynolds saw the minivan parked in the access road to appellant's trailer. Reynolds took some photographs of the minivan, which apparently showed the damage to the vehicle.

Reynolds was approaching the door to appellant's trailer when the door opened and appellant stepped out. Appellant's mother stood in the doorway and then stepped back.

Reynolds asked appellant what his name was. Appellant handed him an identification card. Reynolds asked how his or his mother's vehicle had been damaged. Appellant said, "That's why you're here." Appellant went on to say that "things are f*** up; that he [appellant] was trying to get his check. His girlfriend had broken up with him. And he really doesn't remember anything else." Reynolds placed appellant under arrest.

### 2. *The Defense Case*

Appellant took the stand and testified in his own defense. He did not do well. His answers were frequently garbled, not responsive to the question asked, and from time to time not credible. Given that credibility was one of the most important issues in this case, appellant did himself much harm by first insisting, contrary to all the physical evidence, that he did not crash into the building and then reluctantly admitting that this actually happened. We cover this in detail below.

We first summarize his testimony on direct examination since that was the defense he was trying to mount.

Appellant obtained work as a forklift operator through Nexem. He had never picked up his paycheck at Nexem. On the

Tuesday preceding Friday, July 13, 2018, he was told at Custom Goods not to come in because there was no work. He did not work on Wednesday, Thursday, or Friday. On Friday, July 13, 2018, he went to Nexem to pick up his check because, not having worked since Wednesday, he assumed that his check would be at Nexem. Normally he received his paychecks at the worksite from Hilda.

When he arrived at Nexem, he said, speaking to a woman, " 'Good morning. My name is Jesus Hernandez. I'm here to pick up a check.' " She asked him where he worked. When he told her it was in Carson, she replied that there was no company in Carson that Nexem was familiar with. Appellant gave the woman his identification so she could see if there was a check for him. She asked him to give her a second and then gave him back his I.D., apparently telling him that his check was at the worksite. He said okay and thanked her.

He left and went to the worksite in Carson. He was looking for Hilda but could not find her. He went back to Nexem to find the lady with the check. At Nexem, he was told that Hilda was at the worksite. Appellant felt that the woman at Nexem was not helping him. He asked for her name and for the headquarters number. Appellant testified that he was not upset, he was "more like lost." He then contradicted himself by testifying that he was upset because he wasn't being helped. He repeatedly denied using the "f" word, stating he never used that word.

He got into his car. "I put my seat belt on, turn on the car, and I was very in a hurry." He put the gear in reverse and "accelerated slightly a little bit. [¶] . . . I look back forward. I put the reverse, I looked back. I look back forward, I accelerated backwards, and then I held on to the handle and I couldn't let go

of the acceleration. My intent was to slide the handle all the way down to the 'D.' " The car moved backward at no more than at five miles an hour.

When asked whether he realized that there was anything wrong, appellant replied that he was shaking. Asked why he was shaking, appellant was unable to give a cogent reply.[3]

He accelerated, trying to put the gear on "D." He did not realize he had backed into a building, he thought he had hit a "sidewalk bump." That scared him a lot. He felt "physically embarrassed and scared. Really, really embarrassed."

"I stopped the car, I looked back and I see no damages. I felt as if I make a collision. I didn't make contact with the—with the agency." There was broken glass from his car. "I looked around and I saw everything fine except for myself and being embarrassed and feeling helpless, I left." He did not get out to look at the damage because he was embarrassed. He did not think he had hit the building.

Appellant admitted that the video showed him driving the car.

Although he initially wanted to drive to Carson to pick up his check, he wound up going home. At home, he looked at the damage to the car and he thought that there was a chance that he had made contact with the building. He began to think that "cops are gonna be involved" because of the damages to his car.

_____

[3] "[Counsel:] Why were you shaking? [¶] [Appellant:] I have no idea. I was walking out—as soon as I asked—I don't know her name again—as soon as I asked her for her name and the number to headquarters, I wasn't able to talk I felt—I said, thank you, but I said I'm gonna call, thank you, but I wasn't able to say that. I was like—"

He was also concerned about the video and thought the video might cause the police to look for him. His lawyer asked whether he thought he had done something wrong. He replied: "Yes. My—my—um, my whole perspective changed as when I was aware of—aware of the car damages on mine, I was like, okay, there is possibly a chance that I did make contact with the agency's establishment." When his mother asked him what had happened, he kept telling her he didn't know because he was so shaken.

Appellant stated he had never planned to back into the building and, when asked whether he had intended to do so, he answered no.

Appellant pleaded guilty on June 27, 2018, to one count of misdemeanor domestic violence.

Cross-examination brought out very few additional facts. For the most part cross-examination amounted to an elaboration of appellant's protestations.

Appellant was 23 years old in July 2018. He has been driving since he was 16. He claims not to have been in any traffic collisions.

Appellant thought that everything Y.G. had testified to was a lie. He denied seeing Y.G. and Susan at the Nexem office. His claim that he had not seen Y.G. was particularly unconvincing.[4]

---

[4] "[Prosecutor:] You didn't see either one of them or you saw one? Which is it? [¶] [Appellant:] Never. I never seen anyone. I—I always try to make, well, squinting through the glass to try to make contact. I didn't even know if I was even speaking to a woman. [¶] [Prosecutor:] You didn't know you were speaking to a woman? [¶] [Appellant:] Could have been a man."

He claimed to have been in a great mood when he initially entered the Nexem office.

When the van hit the curb, "[Appellant:]  I let go of everything.  [¶]  [Prosecutor:]  So now you have lost control of the car?  [¶]  [Appellant:]  Completely."  A few moments later, appellant stated that he had "malfunctioned.  I wasn't in my right state of mind.  I was such in a hurry."

## DISCUSSION

## I.  THE PROSECUTOR DID NOT COMMIT MISCONDUCT

We note at the outset appellant's general concession that trial defense counsel did not object to any of the claimed acts of misconduct.  As respondent correctly points out, claims of prosecutorial misconduct are not preserved for appeal if the defendant fails to object and seek a curative admonition, if an objection and admonition would have cured the injury.  (*People v. Crew* (2003) 31 Cal.4th 822, 839.)  However, since appellant also claims that his counsel was ineffective because he failed to object to various acts of misconduct, we examine the substantive merits of appellant's claims of misconduct.  We find that none of the claims of misconduct are substantively meritorious.

The basic flaw of all the misconduct claims is that they are not supported by the facts of record.

### 1. *The prosecutor did not accuse appellant of lying during cross-examination*

Appellant contends that instead of questioning him about the evidence, the prosecutor "directly accused him of lying."  The exchange upon which this contention is based was as follows:

"[Prosecutor:]  Okay.  You heard the testimony that Ms. [Y.G.] said otherwise and that you said, "I

|  |  |
|---|---|
|  | want my fucking check.  Give me my fucking check."  Is that right?  You heard that? |
| "[Appellant:] | I heard them say that.  That never happened. |
| "[Prosecutor:] | So you're saying that that's a lie? |
| "[Appellant:] | Yes. |
| "[Prosecutor:] | So, the entire testimony that Ms. [Y.G.] gave regarding that first incident is incorrect?  Is that what you're saying? |
| "[Appellant:] | What she wrote on her statement—and she has spoken up here herself—everything is a lie. |
| "[Prosecutor:] | But.  You're telling the truth? |
| "[Appellant:] | Yes. |
| "[Prosecutor:] | So you never used any curse words during that first incident? |
| "[Appellant:] | No.  I have a very professional demeanor.  I am very respectful." |

Appellant states that "[a]lthough the prosecutor did not use the word 'perjury' when questioning Mr. Hernandez, that was clearly her point."  We do not agree.

Appellant had just accused Y.G. of lying in no uncertain terms.  According to appellant, "everything is a lie" that Y.G. uttered.  Specifically, Y.G.'s testimony that appellant had used the "f" word in asking for his check was a lie; it "never happened."

Given this rather explosive testimony, the prosecutor first established with one follow-up question that appellant actually meant what he said.  The next question was also a logical follow-up in that it made sense to discover whether appellant was limiting his opinion to only one part of Y.G.'s testimony or was he applying it to its entirety.  The latter being the case, the prosecutor asked appellant if, contrary to Y.G., he was telling the

10

truth. This was clearly a question ("But. You're telling the truth?") and not an accusation that appellant was lying. Although it is possible that the question was asked with a touch of irony,[5] it is too much to turn the question on its head and conclude it was a charge of perjury. In any event, the question actually served appellant's interests. The question gave appellant an opportunity to maintain that he, unlike Y.G., was telling the truth. He availed himself of that opportunity and stated that he was telling the truth.

Appellant goes on to claim that the question was argumentative and was therefore improper. "An argumentative question is a speech to the jury masquerading as a question. The questioner is not seeking to elicit relevant testimony . . . [t]he question may, indeed, be unanswerable." (*People v. Chatman* (2006) 38 Cal.4th 344, 384.) In this case, the question "But. You're telling the truth?" was an inquiry whether, *unlike Y.G.*, appellant was telling the truth. The question was perfectly susceptible to an answer, in fact it was an opportunity for appellant to maintain that he was telling the truth.

Appellant would like this court to interpret the question "But. You're telling the truth?" as an accusation that appellant was committing perjury. This we will not do. The question is simple enough, it is straightforward and requires no interpretation. It cannot be construed as diametrically opposed to its plain text.

---

[5] There is of course no way of knowing what the tone of the question was.

### 2. *The prosecutor did not ask appellant whether other witnesses were lying*

We address in the next section appellant's argument that the prosecutor committed misconduct in her *closing argument* when she attacked appellant's credibility. This is an entirely different issue from the question whether it was misconduct to ask appellant, as a witness on the stand, whether another witness was lying.

Appellant contends that the prosecutor asked him "to comment on the truthfulness of another witness." Citing *United States v. Sanchez* (9th Cir. 1999) 176 F.3d 1214, 1220, appellant claims that the prosecutor's questions asking appellant whether another witness was lying infringed the jury's right to make those credibility decisions.

The views are divided whether it is improper to ask a defendant-witness whether other witnesses were lying. As noted in *People v. Foster* (2003) 111 Cal.App.4th 379, 384–385, some jurisdictions have held such questions to be always impermissible, other jurisdiction have held such questions not to be misconduct, and yet another school of thought is that they are proper under limited circumstances and must be considered in their context. The cases discussed in *Foster, supra,* 111 Cal.App.4th 379 are generally referred to as the "were they lying" cases, and we will follow suit. (See *People v. Chatman, supra,* 38 Cal.4th at pp. 383–384.)

It was appellant who volunteered that Y.G. was lying. When the prosecutor asked whether he had heard Y.G.'s testimony, it was appellant who said, "I heard them say that. That never happened." Thus, that a witness was lying was a matter introduced by appellant, not the prosecutor.

12

The follow-up question by the prosecutor "So you're saying that was a lie?" was just that, an attempt at clarifying what appellant's testimony was. The second follow-up question[6] was again nothing more than an attempt to clarify what appellant was claiming, i.e., was he claiming that only a part or all of Y.G.'s testimony was false. The question made sense since appellant had reacted only to Y.G.'s statement that appellant had told her to give him the "f*** check." At that, the prosecutor did not ask in the second question whether Y.G. was lying, she asked whether Y.G.'s testimony was "incorrect."

That Y.G. was lying was brought up by the testifying defendant, not the prosecutor, and the two questions the prosecutor asked were only follow-up questions to clarify appellant's testimony on this subject. Thus, even under those cases that have held that "were they lying" questions addressed to a testifying defendant are improper, there simply was no such question propounded by the prosecutor. As far as *United States v. Sanchez, supra*, 176 F.3d 1214 is concerned, our Supreme Court advises us that in these "were they lying" cases "reliance on federal cases is misplaced" because the federal cases involve applications of the federal rules of evidence, which are not binding on us. (*People v. Chatman*, *supra,* 38 Cal.4th at p. 381, fn. 15.)

We conclude that the prosecutor did not commit any misconduct in the portion of appellant's cross-examination cited by appellant.

---

[6] "So the entire testimony that Ms. [Y.G.] gave regarding the first incident is incorrect?  [¶]  Is that what you're saying?"

13

### 3. *The prosecutor did not commit misconduct in arguing that appellant was not telling the truth*

Appellant contends that the prosecutor accused him of "chunking up the duces" without any supporting evidence.[7]  In addition, appellant claims that the prosecutor told the jury that appellant was lying when he claimed to have gone back to the worksite for his check.  Appellant also claims the prosecutor accused him of lying about not using the "f" word when asking for his check.

"A prosecutor engages in misconduct by misstating facts or referring to facts not in evidence, but he or she enjoys wide latitude in commenting on the evidence, including urging the jury to make reasonable inferences and deductions therefrom." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 95.) "Referring to testimony as 'lies' is an acceptable practice so long as the prosecutor argues inferences based on the evidence and not on the prosecutor's personal belief." (*People v. Sandoval* (1992) 4 Cal.4th 155, 180.)

Appellant is mistaken when he claims that the prosecutor accused him of "chunking up the duces" without referring to the evidence.  The prosecutor was arguing that if it was really an accident, as appellant claimed, he would have stopped and

_____

[7] Our research into what "chunking up the duces" means led us to the Neologisms database of Rice University which informs us that this can mean giving the peace sign with two fingers or declining an invitation to attend a function.  As we discuss below, given that the prosecutor was arguing that if this was an accident, appellant would have stopped to say he was sorry, we interpret the prosecutor to be saying that appellant chose to leave the site without an explanation, which is certainly true.

apologized and called the police; and he would have told his mother that he had done something wrong, was sorry and asked for forgiveness.  But that is not what appellant did; he left the site without any explanation and failed to tell his mother what had happened.  As far as lying about going back to the worksite was concerned, the prosecutor argued that appellant claimed he made the round-trip in 20 minutes, an impossibility, which was an indication he was lying.  Finally, as far as the "f" word is concerned, the prosecutor pointed out that two witnesses testified that he did use that word, which again showed he was not telling the truth.

The prosecutor based her characterization of appellant as a liar on the evidence, and not on her personal beliefs.

Unfortunately, appellant also attacks the prosecutor's argument on grounds that are not supported by the record.  Thus, appellant states, without citing to the record, that instead "of attacking the evidence regarding Mr. Hernandez's actual defense that the vehicle malfunctioned,[8] the prosecutor simply told the jury that Mr. Hernandez's only defense was to lie."  There is no support for this in the record.[9]

Contrary to appellant's assertion, it is permissible for a prosecutor to argue that a testifying defendant lied, as long as

_____

[8] It takes considerable good will to read this defense into appellant's testimony.

[9] After the quoted sentence, the opening brief states: "According to the prosecutor, if Mr. Hernandez confirmed the prosecution's theory of the case, he would be found guilty, so he obviously lied."  This sentence cites to reporter's transcript 700, but there is no support for this sentence in reporter's transcript 700.

this claim is tied to the evidence and not the prosecutor's personal opinion.  In arguing from time to time that appellant had lied, the prosecutor in this case complied with this standard.

### 4. *The prosecutor did not denigrate defense counsel*

During defense counsel's closing argument, he described an experience he had with his father when he was young.  They were watching a television show on the Audi's sudden acceleration issue.  He thought that his father planned to give him "a really nice car," but he ended up with his father's old diesel Mercedes.  When counsel backed up the car, it did not initially move, so he "floored" the accelerator pedal.  To his surprise, "the car lurched backwards very, very quickly," and counsel ended up hitting the car behind him.  Defense counsel argued:

"I think in our society, especially with what we see in the news and on TV and social media, we're in a state where we feel like we make decisions by committee and the majority rules.  So if 50.5 percent vote for a candidate, that's the candidate that wins and that person is the winner and the other person is an absolute loser."

Counsel asked the jurors to "please respect one another" if they disagreed with each other, and to "[u]nderstand that there are differences of opinion."  He urged the jurors that if any of them have "a fundamental disagreement, you're entitled to . . . stick to your position.  You do not have a responsibility of . . . delivering a verdict either way."

During the prosecutor's subsequent rebuttal argument, she commented on defense counsel's closing argument by stating as follows:

"You know why you keep hearing about Audi's and TV shows and diesel cars and voting candidates and juror

16

disagreements? It's because he stayed clear of his client's statements because he knows it's a bunch of baloney. He can't get up here with a straight face and say believe what he said because it's beyond what's true because it makes no sense."

This was not an attack on defense counsel's integrity, which is the focus of our inquiry. (See *People v. Medina* (1995) 11 Cal.4th 694, 759 [reviewing court will determine if prosecutor demeaned defense counsel's integrity].) Rather, the message was that defense counsel exercised good judgment in not focusing on his client's testimony and instead spoke of things that had no real relationship to the case. Whatever the merits of this observation may be, it came across as something of a compliment and certainly not as a personal attack on defense counsel.

What concerns us is the sentence "he stayed clear of his client's statement because he knows it's a bunch of baloney." It is improper for a prosecutor to argue that defense counsel believes his client is guilty. (*People v. Bell* (1989) 49 Cal.3d 502, 537.) The foregoing sentence was arguably subject to an objection, even if the prosecutor stopped short of saying the defense counsel believed his client to be guilty; it was his "statement" that was "baloney." Although an objection could have been interposed, it was the better course to let the matter go without an objection. An objection would have drawn the jury's attention to defense counsel's attitude toward the case, which was not a subject that held any promise for appellant. It is also very likely that, in the end, the objection would have been overruled, which would have made matters needlessly worse.

We conclude that the facts simply do not support the claims of misconduct.

## II. THE CONVICTION OF FELONY VANDALISM
## IS SUPPORTED BY SUBSTANTIAL EVIDENCE

Appellant contends that there is "insufficient evidence to establish that this incident was anything more than [an] unfortunate accident.  The necessary element of malice in this case was not proven beyond a reasonable doubt."

"The words 'malice' and 'maliciously' import a wish to vex, annoy, or injure another person, or an intent to do a wrongful act, established either by proof or presumption of law."  (§ 7, subd. (4).)  Malice in law may be presumed or implied from the intentional doing of the act without justification or excuse or mitigating circumstances.  (*People v. Kurtenbach* (2012) 204 Cal.App.4th 1264, 1282, citing *In re V.V.* (2011) 51 Cal.4th 1020, 1028.)  Implied malice does not require hatred or enmity toward the person injured.  (*People v. Bender* (1945) 27 Cal.2d 164, 180.)

The physical evidence is uncontroverted.  The minivan driven by appellant crashed into the Nexem office and penetrated to a depth of two feet.  It was very probable that it was stopped by a heavy printer inside the office.  The stipulated amount of damages done was considerable ($9,550).

The only issue left was whether appellant deliberately and intentionally backed into the Nexem office.  On this issue, appellant did not help himself as a witness.  His description of the course of the car at the critical moments was vague and evasive.[10]  Although he had the opportunity to say so, he did not

_____

[10] He got into his car.  "I put my seat belt on, turn on the car, and I was very in a hurry."  He put the gear in reverse and "accelerated slightly a little bit.  [¶]  . . . I look back forward.  I put the reverse, I looked back.  I look back forward, I accelerated backwards, and then I held on to the handle and I couldn't let go

18

state at this point that it was an accident. Nor did he have an explanation for the evident force with which he backed up. If he had given a cogent explanation for how it happened that the car ended up two feet inside the Nexem office, it is very probable that the jury would have exonerated him. As appellant points out, the jury did wrestle with the issue of vandalism but, in the end, it concluded that appellant had intentionally backed the van into the Nexem office.

This conclusion was supported by circumstantial evidence. Despite appellant's protestations, there is evidence from two witnesses that he was angry and upset and even abusive in his demand for his check and that he left the Nexem office both times angry and upset. In fact, it is not too much to say that according to the testimony of Y.G. and Susan appellant was not just angry but furious when he left Nexem the second time. There is of course no way that he could have traveled to the worksite and back in 15 minutes, which means that instead of trying to get his check, he was nursing his anger. Particularly revealing is that he refused to tell his mother what had happened when it was plain as day that he had crashed the car into something. If there had been any kind of reasonable explanation for what had happened, he surely would have told her what that explanation was. And, as noted, the lack of a credible explanation by appellant of the supposed mechanics of the "accident" is a further circumstance that militates against him.

Our task at this point is not to retry the case but to determine if there is substantial evidence in the record to sustain

_____

of the acceleration. My intent was to slide the handle all the way down to the 'D.' " The car moved backward at no more than at five miles an hour.

19

the judgment. "[I]t is the jury, not the appellate court, which must be convinced of his guilt beyond a reasonable doubt. [Citation.] We review the entire record in the light most favorable to the judgment and affirm the convictions as long as a rational trier of fact could have found guilt based on the evidence and inferences reasonably drawn therefrom." (*People v. Millwee* (1998) 18 Cal.4th 96, 132.)

There is direct and uncontroverted evidence that appellant crashed into the Nexem office. There is circumstantial evidence of malice in the form of his anger, his evasive description of the "accident," his failure to explain the mechanics of the supposed failure that caused the van to back into the building and telling his mother he didn't know what happened, which was of course a lie. All of these circumstances show that he intentionally backed into the building without any justification or excuse, which means he acted with malice. (*People v. Kurtenbach, supra*, 204 Cal.App.4th at p. 1282.)

### III.  COUNSEL WAS NOT INEFFECTIVE

Since we have concluded that the prosecutor did not commit any acts of misconduct that could have drawn valid objections by defense counsel, appellant's contention that counsel was ineffective because he did not lodge any objections to these alleged errors is moot. We therefore decline to address this contention. (*Jordan v. County of Los Angeles* (1968) 267 Cal.App.2d 794, 798 [reviewing court will not consider moot point].) We therefore have no reason to conclude anything other than that defense counsel was not ineffective.

### IV.  REVIEW OF THE CONFIDENTIAL FILE

On October 23, 2019, the superior court reviewed a confidential file submitted by the People and found that there

20

was nothing discoverable in that file. We have reviewed that sealed file at appellant's request and confirm that it did not contain any discoverable material.

## V. IN ACCORDANCE WITH ASSEMBLY BILL NO. 1950, THE TERM OF APPELLANT'S PROBATION IS REDUCED FROM FIVE YEARS TO TWO YEARS

While this appeal was pending, AB 1950 took effect on January 1, 2021. (Stats. 2020, ch. 328, § 2.) AB 1950 reduced the maximum probation term for most felony offenses to two years. (§ 1203.1, subds. (a) & (m).) Because the reduction in the length of the probation term has an ameliorative effect, we presume that our Legislature intended to make its effect retroactive to nonfinal convictions in the absence of an express savings clause specifying a contrary intent. (*In re Estrada* (1965) 63 Cal.2d 740, 744–747.)

AB 1950 contains no such savings clause. Therefore, in accordance with AB 1950, the maximum term of appellant's probation as to count 3 is now two years. (Accord, *People v. Sims* (2021) 59 Cal.App.5th 943, 955–964 [reaching same result]; *People v. Quinn* (2021) 59 Cal.App.5th 874, 884–885 [same].) We consequently remand the matter to the trial court to correct the minute order governing the length and terms of probation to reflect a two-year term of formal probation. Should either the respondent or the appellant wish to make further motions regarding the length or terms of probation, each may file the appropriate motion(s) with the trial court.

21

## DISPOSITION

The term of probation imposed as to count 3 is reduced from five years to two years. The trial court is directed to correct the minute order to reflect the imposition of a two-year term of formal probation, and to notify the Los Angeles County Department of Probation of the change to appellant's probationary term. As modified, the judgment is affirmed.

NOT TO BE PUBLISHED.



LUI, P. J.

We concur:



CHAVEZ, J.



HOFFSTADT, J.