Filed 7/15/22 P. v. Lua CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ENRIQUE LUA,<br><br>    Defendant and Appellant. | H047760<br>(Santa Clara County<br>Super. Ct. No. C1776825) |

Appellant Enrique Lua was convicted by a jury of multiple sexual offenses against his girlfriend's daughter and niece, who were both under the age of 10, and was sentenced to an aggregate indeterminate term in prison of 110 years to life consecutive to a determinate term of two years. On appeal, Lua challenges the constitutional adequacy of the jury instructions as to the prosecutor's burden of proving each element of each crime beyond a reasonable doubt. He also argues that his trial counsel was ineffective in failing to litigate the adequacy of the operative information, given the five-year period over which it was alleged he committed the charged offenses. In successive supplemental briefs, Lua argues that remand for resentencing is required under Assembly

Bill No. 518 (2021-2022 Reg. Sess.), which recently amended Penal Code section 654,[1] and Senate Bill No. 81 (2021-2022 Reg. Sess.), which recently amended section 1385.

We discern no merit in Lua's constitutional claims but conclude that resentencing is required under Assembly Bill No. 518. We therefore reverse the judgment and remand the matter for resentencing.

## I. BACKGROUND

A. *The Operative Information*

On August 23, 2019, the Santa Clara County District Attorney's Office filed a first amended information charging Lua with six counts of lewd or lascivious acts by force, violence, duress, menace, and fear on a child under the age of 14 (§ 288, subd. (b)(1); counts 1-4, 18 & 19), two counts of sexual intercourse or sodomy with a child 10 years of age or younger (§ 288.7, subd. (a); counts 5 & 6), six counts of oral copulation or sexual penetration with a child 10 years of age or younger (§ 288.7, subd. (b); counts 7-10, 20 & 21), two counts of aggravated sexual assault of a child (sexual intercourse) (§ 269; counts 11 & 12), four counts of aggravated sexual assault of a child (oral copulation) (§ 269; counts 13, 14, 22 & 23), two counts of aggravated sexual assault of a child (sexual penetration) (§ 269; counts 15 &16), and one count of sending harmful matter to a minor (§ 288.2, subd. (a)(1); count 17).

Counts 1 through 17 identified M.D. as the victim and counts 18 through 23 identified J.D. as the victim. As to counts 1 through 4, 18, and 19, it was further alleged that Lua had been convicted either in the present case or in past cases of sexual offenses against multiple victims for purposes of indeterminate sentencing under section 667.61, subdivisions (b) and (e). During trial, count 17 was amended to allege a violation of section 288.2, subdivision (a)(2) rather than (a)(1).

---

[1] Unspecified statutory references are to the Penal Code.

**B.** *The Prosecution's Case*

    **1.** *M.D.*

M.D. was twelve years old at the time of Lua's trial. Lua started dating M.D.'s mother when M.D. was four or five years old, and M.D. used to refer to Lua as her "dad." M.D. lived with Lua and her mother in a cottage that was located behind a house on the same property. M.D.'s grandmother lived in the front house. M.D.'s mother shared a bed with Lua while M.D. slept on her own loft-style bed in the same room.

According to M.D., Lua sexually assaulted her numerous times in the back cottage when she was between the ages of seven and 10 years old. When M.D. was seven years old, Lua made her touch his penis multiple times, and he showed her a video on his phone of a man and a woman having sex. When M.D. was eight years old, Lua touched her "private" area with his hand over her underwear and made her touch his penis "probably" more than five times.[2] When M.D. was either eight or nine years old, Lua made her orally copulate him at least five times. When M.D. was nine years old, Lua rubbed his penis against her naked "private" area and had her orally copulate him. When M.D. was 10 years old, Lua touched her "private" area under her underwear with his hands several times, and, on two or three occasions, part of Lua's hand went slightly inside her vaginal "lips." Also when M.D. was 10 years old, Lua rubbed his penis against her "private" area and tried to penetrate her multiple times.

When M.D. was nine or 10 years old, her cousin, J.D., moved into the front house. M.D. saw Lua touch J.D. inappropriately multiple times. M.D. once saw Lua rub J.D.'s "private" area under a blanket, and on another occasion, M.D. saw Lua rub his penis against J.D.'s "private" area. Once, Lua had M.D. and J.D. take off their pants alternated rubbing his penis against M.D. and J.D.'s "private" areas.

---

    [2] M.D. clarified that when she referred to her "private," she was talking about her "vagina."

3

M.D. testified that she was uncomfortable and confused when Lua first molested her, but she feared Lua, having seen him hurt her mother in the past. Lua told M.D. not to tell anyone about what was happening because he did not want to go to jail. When M.D. was approximately nine years old, she and J.D. both wrote notes describing their experiences with Lua. In her note, M.D. wrote that "[f]or three years, Dad has raped me.' "

## 2. *J.D.*

J.D. and M.D. were cousins, and J.D. used to call Lua her uncle. When J.D. was around nine years old, she and her family moved into the house in front of the cottage where M.D. then lived.

According to J.D., Lua started touching her inappropriately when she moved into the front house. One time, Lua squeezed her buttocks and touched her "vagina" through her underwear, slipping a finger "just under the opening."[3] Another time, Lua approached J.D. and M.D. in the backyard, pulled out his penis, and told the two girls to "suck his dick." J.D. generally testified that Lua touched her "vagina" multiple times, though his hand usually did not penetrate her vaginal opening. He licked her "vagina" once. Lua also placed J.D.'s hand on his penis between five and ten times, rubbed his penis against her buttocks at least five times, asked her to suck his penis, touched her breasts at least three times, and slapped the back of her head with his penis. J.D. estimated that Lua rubbed his penis against her buttocks at least five times. J.D. recalled that one time, Lua had M.D. suck on his penis while J.D. rubbed it with her hand.

M.D. suggested to J.D. that they should write notes about what was happening with Lua. J.D. wrote a note, but she was afraid that Lua would find out. Eventually,

---

[3] J.D. testified that she knew what her "private parts" were and knew what her "vagina" was. J.D. generally testified that Lua touched her "vagina" but did not identify specific parts of her sexual organ.

J.D.'s mother found her note and confronted her about it. J.D. was afraid, so she initially told her mother that her allegations were not true.

**C.** *The Defense*

Lua testified on his own behalf. He met M.D.'s mother in 2010 and started a relationship with her, and he had a father/daughter relationship with M.D. Lua moved in with M.D.'s mother sometime in 2011, and he shared one car with M.D.'s mother. Due to his work schedule, Lua had little time alone with M.D. Even when Lua was at home, M.D. frequently slept over at her paternal grandmother's house, and Lua's cousin, "Junior," visited Lua every day. For a period of time, Lua's younger sister lived with him, M.D., and M.D.'s mother; his younger sister acted as Lua's caretaker while he recovered after a surgery.

Lua testified that about a week before the police came, he refused to permit M.D. to attend a school dance, so she became upset. Lua had also tried to prevent M.D. from visiting her biological father, because she often came home upset after visits. Lua and M.D.'s mother were also planning to have a baby together, and M.D. had said that she was afraid that Lua would love the baby more than he loved her. Lua denied ever inappropriately touching M.D. or J.D.

Lua's older sister testified that Lua had lived with her in 2009, when her daughters were two and five years old, and he had helped watch his nieces. After Lua moved out, his nieces visited him and had sleepovers with M.D. at the back cottage approximately three times a month. Lua's sister never observed Lua engage in any odd behavior with her daughters. She often showed up unannounced to visit him and would go directly to the back cottage, where the door would be open.

One of Lua's nieces testified that she had no issues or problems with how Lua helped raise her and her younger sister.

5

**D.**   *The Verdict and Sentencing*

On October 15, 2019, a jury found Lua guilty of all charged counts and found true all the allegations as alleged in the information. The trial court imposed two terms of 25 years to life for Lua's convictions for sexual intercourse or sodomy with a child 10 years of age or younger (§ 288.7, subd. (a); counts 5 & 6) and four terms of 15 years to life for Lua's convictions for aggravated sexual assault of a child (oral copulation) (§ 269; counts 13, 14, 22 & 23), consecutive to a midterm of two years for his conviction for sending harmful matter to a minor (§ 288.2; subd. (a)(2); count 17). The trial court imposed and stayed under section 654 sentences of 15 years to life for the remaining counts, with the exception of counts 11, 12, 15, and 16, for which it failed to pronounce any sentence. In total, the trial court sentenced Lua to a term of 110 years to life in prison consecutive to a determinate term of two years.

## II. DISCUSSION

**A.**   *Instructional Error*

Lua argues that the trial court confused the jury and violated his right to due process of law by failing to reiterate that the prosecutor is required to prove each element of each crime "beyond a reasonable doubt."

**1.**   *Background*

After the close of evidence, the trial court instructed the jury. The court administered, inter alia, CALCRIM No. 200, which instructed the jury to "[p]ay careful attention to all of these instructions and consider them together." The trial court then instructed the jury with CALCRIM No. 220, which states in pertinent part: "A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt."

The trial court then proceeded to instruct the jury with various instructions including, among others, instructions on the definition of evidence (CALCRIM No. 222),

6

the use of character evidence (CALCRIM No. 350), as well as all 23 counts alleged in the information.

Thereafter, the trial court instructed the jury as to the elements of each offense. The jury instructions pertaining to each charged offense stated that "[t]o prove that the defendant is guilty of this crime, the People must prove" the elements of each offense. As to the multiple victim enhancement, CALCRIM No. 3181, the instruction specifically stated that "[t]he People have the burden of proving this allegation beyond a reasonable doubt."

### 2. *General Legal Principles and Standard of Review*

Due process requires that the government prove beyond a reasonable doubt each element of a charged offense, but "the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. [Citation.] Rather, 'taken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury.' [Citation.]" (*Victor v. Nebraska* (1994) 511 U.S. 1, 5; *In re Winship* (1970) 397 U.S. 358, 364.) "In California, a trial court ordinarily satisfies [its obligation to instruct on reasonable doubt] by instructing the jury under one of two 'pattern' or 'standard' reasonable doubt instructions," including CALCRIM No. 220, which was given in Lua's case. (*People v. Aranda* (2012) 55 Cal.4th 342, 349.)

" 'A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant. [Citations.]' [Citation.] ' "[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." [Citations.]' " (*People v. Solomon* (2010) 49 Cal.4th 792, 822.)

We review de novo whether jury instructions correctly state the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

7

### 3. *Analysis*[4]

Lua argues that the instructions given by the trial court failed to adequately inform the jury that the People had to prove each element of the charged offenses beyond a reasonable doubt by failing to insert after every iteration of "the People must prove" with "beyond a reasonable doubt."

We conclude that there was no instructional error. By administering CALCRIM No. 220, the trial court specifically instructed the jury that whenever the instructions state that "the People must prove something," it means that "they must prove it beyond a reasonable doubt." Each of the subsequent instructions that described the elements of each offense stated that "[t]o prove the defendant is guilty of this crime, the People must prove" the following elements. Construing the instructions as a whole, the jury was informed that the People were required to prove each element of each charged offense beyond a reasonable doubt.

Lua argues that the length and order of the jury instructions inevitably confused the jury because the trial court gave multiple other instructions after it gave CALCRIM No. 220 and before it instructed as to the elements of each offense. However, "[j]urors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions." (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.) Lua points to no evidence that the jury did not understand the instructions as given, and the record does not affirmatively demonstrate that the jury misinterpreted the People's

---

[4] " 'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' " (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012.) Because an error, if any, in the definition of reasonable doubt would affect "the substantial rights of the defendant," we assume for the purposes of this appeal that Lua has not forfeited his claim of instructional error and proceed to the merits. (§ 1259.)

8

burden. Rather, he posits that the jury must have been confused because it found him guilty despite inconsistencies between the accounts of the two victims.

That the jury found M.D. and J.D. to be credible does nothing to support Lua's theory that it was confused as to the burden of proof. It was within the jury's purview to overlook discrepancies in the evidence after evaluating the victims' demeanors. (See *People v. Sanchez* (2003) 113 Cal.App.4th 325, 330 ["[i]t is the exclusive function of the trier of fact to assess the credibility of witnesses and draw reasonable inferences from the evidence"].)

Multiple Courts of Appeal have concluded that CALCRIM No. 220's standard instruction on reasonable doubt adequately conveys the People's burden of proof even though it omits a specific instruction that the jury is required to find each *element* of a crime true beyond a reasonable doubt. (*People v. Riley* (2010) 185 Cal.App.4th 754, 767-770; *People v. Henning* (2009) 178 Cal.App.4th 388, 405-406; *People v. Ramos* (2008) 163 Cal.App.4th 1082, 1087-1090; *People v. Wyatt* (2008) 165 Cal.App.4th 1592, 1600-1601.) Lua provides no authority or other principled basis for concluding that even more should be required of the instructions here.

We therefore reject Lua's claim of instructional error and conclude that the jury instructions, considered as a whole, correctly informed the jury that the People were required to prove each element of the charged crimes beyond a reasonable doubt. Absent instructional error, Lua's derivative argument that the instructions violated his constitutional rights must also fail. (See *People v. Avila* (2006) 38 Cal.4th 491, 596.)

**B.** *Ineffective Assistance of Counsel*

Lua argues that his trial counsel rendered ineffective assistance when he failed to object to the long time frames alleged for each count in the information. The Attorney General claims that trial counsel was not ineffective because the information, coupled with the preliminary hearing testimony and any information obtained during pretrial discovery, gave Lua adequate notice of the charged offenses.

### 1.   *Background*

On April 16 and 17, 2018, M.D. and J.D. testified at a preliminary hearing, each describing that Lua sexually abused them multiple times while they lived on the same property—from age seven to ten for M.D., and nine to ten for J.D.

The trial court held Lua to answer on 22 counts as charged by the prosecutor.[5] The prosecutor subsequently filed a 116-count information that alleged that Lua committed multiple sexual offenses against M.D. and J.D.

Several months later, in August 2019, the prosecutor filed a 23-count first amended information.  As to counts 1 through 17, which pertained to offenses committed against M.D., the information alleged that the crimes were committed "[o]n or about and between November 13, 2012[,] and October 25, 2017."  As to counts 18 through 23, which pertained to offenses committed against J.D., the information alleged that the crimes were committed "[o]n or about and between November 3, 2012 and October 25, 2017."  Counts 1 through 16 and 18 through 23 were further alleged to have been committed when M.D. and J.D. were between "6-10" years old.

### 2.   *General Legal Principles and Standard of Review*

Under the Sixth Amendment of the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the effective assistance of counsel.  (*Strickland v. Washington* (1984) 466 U.S. 668, 686.) The standard for determining whether counsel has rendered ineffective assistance is well settled.  First, a defendant must show that counsel's performance was deficient, which requires the defendant to show that "counsel's representation fell below an objective standard of reasonableness."  (*Id.* at p. 688.)  Second, a defendant must show that he or

---

[5] The prosecutor's initial complaint is not included in the record on appeal. Because the trial court addressed no other counts at the preliminary hearing, we infer that the prosecutor charged only 22 counts in the initial complaint.

she was prejudiced by counsel's deficient performance, which requires the defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Id.* at p. 694.)

Here, Lua argues that his trial counsel was ineffective for failing to challenge the adequacy of notice provided by the first amended information. "The 'preeminent' due process principle is that one accused of a crime must be 'informed of the nature and cause of the accusation.' (U.S. Const., Amend. VI.) Due process of law requires that an accused be advised of the charges against him so that he has a reasonable opportunity to prepare and present his defense and not be taken by surprise by evidence offered at his trial." (*People v. Jones* (1990) 51 Cal.3d 294, 317 (*Jones*).)

In *Jones*, the California Supreme Court considered the due process implications when a young victim of a "so-called 'resident child molester' "—a perpetrator who lives with the victim or has continuous access to the victim—is unable to give specific details regarding the time, date, and location of alleged sexual assaults. (*Jones*, *supra*, 51 Cal.3d at p. 299.) The high court concluded that in a prosecution by information, it is "the transcript of the preliminary hearing, not the accusatory pleading, [that] affords [a] defendant practical notice of the criminal acts against which he [or she] must defend." (*Id.* at p. 317.) Thus, " 'at a minimum, a defendant must be prepared to defend against all offenses of the kind alleged in the information as are shown by evidence at the preliminary hearing to have occurred within the time frame pleaded in the information.' " (*Ibid.*)

### 3. *Analysis*

Lua argues that his defense counsel rendered ineffective assistance by failing to object to the long time frames alleged in the charging information. Based on the applicable law, we find that Lua has not met his burden to demonstrate that there can be no satisfactory explanation for defense counsel's failure to object or demur to the information.

11

Lua acknowledges that *Jones* held that it is the preliminary examination that informs a defendant of his or her criminal charges, but he distinguishes *Jones* by arguing that the alleged conduct in that case took place between a two-month time period, and, in his case, the information alleged that the offenses were committed over a significantly longer time frame, approximately five years. (*Jones*, *supra*, 51 Cal.3d at pp. 317, 303.) Nonetheless, we need not decide whether *Jones* unequivocally permits a prosecutor to allege a nearly five-year time frame when charging sexual offenses. Here, we are evaluating whether defense counsel rendered ineffective assistance, and "[a]n evaluation of counsel's performance does not depend, as an initial matter, on whether ' "a court would retrospectively consider counsel's advice to be right or wrong, but on whether that advice was within the range of competence demanded of attorneys in criminal cases." ' " (*People v. Upsher* (2007) 155 Cal.App.4th 1311, 1328 (*Upsher*).)

Lua cites no case law holding that an accusatory pleading that alleges the commission of crimes over a five-year time span stretches *Jones* beyond its constitutional limits. Both California and federal courts have found no due process violation when a defendant is charged with continuous sexual abuse (§ 288.5, subd. (a)), an offense that often spans multiple years. (*People v. Gear* (1993) 19 Cal.App.4th 86, 94-96 [section 288.5 does not violate a defendant's right to due process]; *Brodit v. Cambra* (9th Cir. 2003) 350 F.3d 985, 988-989 [no due process violation when prosecutor charged defendant with three acts of sexual abuse that occurred between June 1992 and December 1994].) Lua offers no basis for distinguishing these authorities.

Moreover, the information was filed after both J.D. and M.D. testified at the preliminary hearing and described the acts committed by Lua and when they generally occurred. The girls' testimony at the preliminary hearing was largely consistent with their trial testimony in terms of the type, location, and persistence of the sexual contacts over time. Like their trial testimony, the girls testified at the preliminary hearing with a comparable level of temporal generality, keyed to their age at the time. J.D. testified that

Lua molested her when she was between the ages of 9 and 10, and M.D. testified that Lua molested her when she was between the ages of 7 and 10. Although both J.D. and M.D. testified in less detail about Lua's sexual abuse at the preliminary hearing, Lua identifies no particular discordance between the preliminary hearing testimony and trial testimony that would have impaired his knowledge of the offenses the prosecution would seek to prove at trial. As Lua had notice of these dates and the specific acts from the preliminary hearing, trial counsel could reasonably have believed that objecting or demurring to the information would have been futile given the precedent in *Jones*. (*Jones*, *supra*, 51 Cal.3d at p. 317; see *Upsher*, *supra*, 155 Cal.App.4th at pp. 1328-1329 [due to "absence of controlling case law" counsel was not ineffective for failing to move to bifurcate prior conviction trial]; *People v. Foster* (2003) 111 Cal.App.4th 379, 385 [trial counsel was not ineffective for failing to object to line of questioning during cross-examination due to lack of controlling California authority on whether questions were proper]; *People v. Price* (1991) 1 Cal.4th 324, 387 [counsel does not render ineffective assistance by failing to make objections or motions that counsel reasonably determines to be futile], superseded by statute on other grounds as stated in *People v. Hinks* (1997) 58 Cal.App.4th 1157, 1161-1165.) Trial counsel may have also understood that due to Lua's long-standing access to both girls and the sheer number of acts alleged, "neither alibi nor wrongful identification [was] likely to be an available defense," and instead of advancing specific arguments that certain molestations could not have occurred on certain dates, Lua's best defense was to "den[y] that *any* wrongful touchings occurred." (*Jones*, *supra*, 51 Cal.3d at p. 319, italics added.)

Accordingly, Lua is unable to meet his burden to demonstrate that defense counsel's performance fell below an objective standard of reasonableness, as the record does not affirmatively disclose that counsel had no "rational tactical purpose" for failing to object or demur to the information. (*People v. Mai* (2013) 57 Cal.4th 986, 1009;

13

*Strickland*, *supra*, 466 U.S. at p. 688.) We must therefore reject Lua's claim of ineffective assistance of counsel.

## C.     *Resentencing*

After briefing in this case was completed, we requested that the parties submit supplemental briefs on whether Assembly Bill No. 518, which amended section 654, applies retroactively to Lua's case. Lua also filed a separate supplemental brief arguing that the trial court should be permitted to exercise its discretion to strike his section 667.61 enhancements under Senate Bill No. 81, which amended section 1385. We agree with Lua that he is entitled to resentencing due to the ameliorative change in the law effectuated by Assembly Bill No. 518 but conclude that the amendments made by Senate Bill No. 81 are inapplicable to his case.

Lua was convicted of a total of 23 counts. At the sentencing hearing, the trial court orally pronounced sentence as follows: 2 years for count 17; two consecutive terms of 25 years to life for counts 5 and 6; four consecutive terms of 15 years to life for counts 13, 14, 22, and 23; six terms of 15 years to life that were imposed and stayed for counts 1 through 4, 18, and 19; four terms of 15 years to life that were imposed and stayed for counts 7 through 10, and two terms of 15 years to life that were imposed and stayed for counts 20 and 21.

At the time that Lua was originally sentenced, section 654 provided that when an act or omission can be punished by different provisions of law, the trial court must impose sentence "under the provision that provides for the longest potential term of imprisonment." (Former § 654.) In 2021, the Legislature enacted Assembly Bill No. 518, which amended section 654, effective January 1, 2022. (Stats. 2021, ch. 441.) As amended, section 654, subdivision (a) now provides that an act or omission that is punishable in different ways by two different provisions of the law can be punished under either provision; the longest term of imprisonment is no longer mandated.

We agree with the parties that Assembly Bill No. 518 retroactively applies to Lua's case and remand is required for resentencing. (*In re Estrada* (1965) 63 Cal.2d 740, 744-745 [ameliorative criminal statutes apply retroactively to nonfinal cases in the absence of a contrary legislative intent]; *People v. Sek* (2022) 74 Cal.App.5th 657, 673-674 (*Sek*) [Assembly Bill No. 518 retroactively applies to nonfinal judgments under the *Estrada* rule]; *People v. Mani* (2022) 74 Cal.App.5th 343, 379-380 [same]) Here, the trial court sentenced Lua to two 25-year-to-life terms for his convictions under section 288.7, subdivision (a) but stayed multiple 15-year-to-life terms for his convictions under sections 269 and 288, subdivision (b)(1). Under the former version of section 654, the trial court was required to stay the shorter sentences and impose the longer, 25-year-to-life sentences. Under the new law, the trial court would have the discretion to stay any of the sentences.

Upon remand for resentencing, the trial court must impose a sentence for all counts. As the Attorney General observes, the trial court did not orally impose a sentence for counts 11, 12, 15, or 16, and the minute order after the sentencing hearing does not reflect that a sentence was imposed for these counts. " 'Upon conviction it is the duty of the court to pass sentence on the defendant and impose the punishment as prescribed. (Pen. Code, § 12; [case citations].) Pursuant to this duty the court must either sentence the defendant or grant probation in a lawful manner; it has no other discretion.' " (*People v. Alford* (2010) 180 Cal.App.4th 1463, 1468.) Here, the trial court stated at the outset of the sentencing hearing that it intended to impose a sentence that amounted to a term of 110 years to life consecutive to a determinate term of two years, which it did by imposing sentences on counts 5, 6, 13, 14, 17, 22, and 23. Although it is thus implied that the trial court intended to stay the sentences for the rest of Lua's convictions, including the sentences for counts 11, 12, 15, and 16, "[a] sentence must be imposed on each count,

15

otherwise if the nonstayed sentence is vacated, either on appeal or in a collateral attack on the judgment, no valid sentence will remain." (*Id.* at p. 1469.)[6]

Finally, Lua also argues that upon resentencing, the trial court will have the discretion to strike the enhancements imposed under section 667.61 under section 1385, which, as amended by Senate Bill No. 81, describes how the trial court should exercise its discretion to strike enhancements and what mitigating circumstances it should consider. (See *Sek*, *supra*, 74 Cal.App.5th 657, 674 [Senate Bill No. 81 applies when resentencing takes place after January 1, 2022].) Lua plainly misreads the operative statutes. As amended by Senate Bill No. 81, section 1385, subdivision (c)(1) forecloses dismissal, even "if it is in the furtherance of justice to do so," where "dismissal of that enhancement is prohibited by *any initiative statute*." (Italics added.) Just such an initiative, Proposition 83, prohibits dismissal of the enhancements here under section 667.61, subdivision (g): "Notwithstanding Section 1385 . . . , the court shall not strike any allegation, admission or finding of any of the circumstances specified in [section 667.61] subdivision (d) or (e)." (Prop. 83, § 12, approved Nov. 7, 2006.) [7] The trial court therefore lacks authority under section 1385 to dismiss Lua's section 667.61 enhancements.

At oral argument, Lua contended that the statutory scheme expressly prohibits dismissal of sentencing enhancements while also tacitly leaving the trial court discretion to not impose sentence for those same enhancements. We note, however, that section

---

[6] The trial court's failure to impose sentences for counts 11, 12, 15, and 16, even if it intended to subsequently stay the sentences, results in an unauthorized sentence that may be corrected at any time. (*People v. Scott* (1994) 9 Cal.4th 331, 354-355.)

[7] The Senate Committee on Public Safety in its analysis of Senate Bill No. 81 in fact noted, "enhancements that may not be dismissed by the court due to express language provided by the initiative include those enacted by Proposition 83, pertaining to sex offenses, . . . passed in 2006 . . ." (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 81 (2021-2022 Reg. Sess.), p. 6.)

667.61's sentencing scheme is plainly mandatory where, as here, the requisite circumstances are properly pled and proven. (§ 667.61, subds. (b), (*o*).) To hold that a trial court might refuse to impose a mandatory sentence—based on duly proven sentencing allegations that the Legislature has expressly prohibited it from dismissing— would effectively nullify the prohibition in section 667.61, subdivision (g), and render superfluous section 1385. We do not consider his interpretation to be consistent with the legislative intent. Accordingly, we remand the matter only for the trial court to exercise its discretion under the newly amended version of section 654 and to impose sentences for all counts.

## III. DISPOSITION

The judgment is reversed and remanded for the limited purpose of resentencing. At resentencing, the trial court must exercise its discretion under the current version of Penal Code section 654, as amended by Assembly Bill No. 518. The trial court must also impose a sentence for all counts, including those counts that are stayed under Penal Code section 654. (*People v. Alford* (2010) 180 Cal.App.4th 1463, 1468-1469.)

17

_____
LIE, J.

WE CONCUR:


_____
GREENWOOD, P.J.



_____
GROVER, J.



*People v. Lua*
H047760