Filed 5/21/24  P. v. Carter CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B326137 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA477466) |
| v. | |
| SHARODNEY LASHAWN CARTER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Shelly Torrealba, Judge.  Affirmed and remanded with directions.

Randy S. Kravis, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews and Rama R. Maline, Deputy Attorneys General for Plaintiff and Respondent.

A jury found Sharodney Lashawn Carter guilty of lewd acts against a minor 15 years of age. (Pen. Code,[1] § 288, subd. (c)(1).) In a bifurcated proceeding, the trial court found true the allegation that Carter suffered two prior strike convictions within the meaning of the Three Strikes law. (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d).) The trial court denied Carter's motion pursuant to *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 to strike his prior convictions, and sentenced Carter to 25 years to life in prison. Carter was awarded 458 days of presentence custody credit.

On appeal, Carter contends: (1) the trial court's admission of the victim's preliminary hearing testimony violated his constitutional right to confront witnesses; (2) the trial court's admission of uncharged prior sexual misconduct violated his right to due process; (3) the prosecutor committed misconduct in cross-examination and closing argument; (4) the trial court improperly considered Carter's decision to proceed to trial when it denied his *Romero* motion; and (5) the trial court miscalculated his conduct credits. The People concede that the trial court erred in its calculation of conduct credits, but argue that the claim should be dismissed because Carter failed to move the trial court to correct the error.

We remand the matter to the trial court for the limited purpose of recalculating Carter's conduct credits. In all other respects the judgment is affirmed.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

## FACTS

*Prosecution*

Jasmine, the victim, testified that in December of 2018, when she was 15 years old, she had a sexual relationship with Carter.[2] She met him in 2018 through her mother, Carol Castillo, with whom Carter also had a sexual relationship.

On New Year's Eve of 2018, Carter picked Jasmine up from her house and took her to a hotel. Jasmine told her mother that she was going to a friend's house. Carter kissed Jasmine on the mouth and she kissed him back. Jasmine set up her cell phone to record and then took a video of herself orally copulating Carter. Afterwards Jasmine and Carter showered together and had sexual intercourse. Carter slapped Jasmine twice that night while they were sitting in bed, which scared her. He took her home the next morning.

Jasmine's older sister, Alyssa, testified that she first saw Carter in 2013, when she was about 16 years old. Several times when she was walking home from school Carter "cat-called" at her and gestured to her to come to him. It made Alyssa feel like she needed to walk faster and get home.

In 2016, after Alyssa had left for college, she returned home to her mother's house to find Carter and Castillo watching television. Alyssa was surprised because her mother knew

---

[2] Jasmine testified at the preliminary hearing. At trial the court found that she was an unavailable witness and permitted the prosecution to read the preliminary hearing testimony into the record.

3

Carter had cat-called at Alyssa and that she did not like him. Alyssa did not know that Carter and her mother were friends. After that, Alyssa saw Carter at her mother's house on a regular basis, helping as a handyman. Carter also helped them move into another unit in the apartment complex.

In December 2018, Alyssa noticed a change in Jasmine. She became distant and antisocial, and started running away from home. Alyssa tried to talk to Jasmine about it, but Jasmine would not talk to her. Right before Christmas in 2018, Alyssa was woken up by a phone call at around 3:00 or 4:00 a.m. When she answered, she heard Carter's voice. He sounded very intoxicated. She heard Jasmine in the background screaming and crying for help. Jasmine said, "Let me go." and "Stop. I'm gonna tell my mom and sister what you're doing. You can't do this." Alyssa was very upset and went to her mother's house to see if she knew anything about Jasmine. Castillo told Alyssa that Jasmine said she was spending the night at a friend's house. Alyssa told her mother about the phone call. Castillo and Alyssa drove around looking for Jasmine, but could not find her. Jasmine came home at about 8:00 a.m. Alyssa confronted Jasmine about the phone call, but Jasmine denied it and told Alyssa she was crazy.

Alyssa's friend Brandan, who knew Jasmine well, testified that he also noticed a dramatic change in Jasmine in December 2018. Jasmine used to be happy, but she became cold and distant. In January 2019, Brandan called Jasmine and a man answered. Brandan recognized the man's voice as Carter's. Brandan knew Carter's voice because he had seen Carter around the neighborhood and at Castillo's house. When Brandan asked

Carter where Jasmine was, Carter said, "She's busy right now. She's fucking." Brandan told Alyssa about the phone call.

A few days later, Castillo called Alyssa and told her Jasmine had run away again. Alyssa looked for Jasmine. Brandan stayed with Castillo to calm her. Jasmine eventually came home. Alyssa returned soon afterwards and confronted Jasmine. Jasmine had "attitude." Alyssa became frustrated and left the bedroom where they had been talking. Brandan then went into the bedroom to talk to Jasmine. Based on what Jasmine said to him, Brandan looked through Jasmine's phone with her permission. Brandan found text messages from an unsaved number that were "very derogatory" and "very threatening." Brandan looked for photos or videos associated with the text messages. He found photos and videos of Carter and Jasmine. One video showed Jasmine orally copulating Carter. Brandan forwarded the video to his own phone and told Alyssa about it.

Alyssa turned the video over to the police. Afterwards, she saw Carter outside of her mother's house, driving up and down the street and waiting in his truck. He was always smirking.

At trial, both Alyssa and Brandan identified Jasmine and Carter as the people in the video. The prosecution also introduced evidence that Carter had suffered convictions for rape and unlawful intercourse with a minor in 1992.

### *Defense*

Carter testified that he became friends with Castillo and Alyssa in 2018. He did not meet Alyssa before she left for college, and had not ever cat-called to her. He and Alyssa kissed, but

they never had a romantic relationship. Carter had never met Brandan.

Carter testified that he did not have a romantic relationship with Castillo. They were just friends. Carter did maintenance work at the apartment complex where Castillo and Jasmine lived. On cross-examination, Carter admitted he had sexual intercourse with Castillo.

Carter never had a sexual or romantic relationship with Jasmine. He denied that he was the man with Jasmine in the cell phone video.

## DISCUSSION

### *Admission of Victim's Preliminary Hearing Testimony*

At trial, the prosecution moved to admit Jasmine's preliminary hearing testimony pursuant to Evidence Code sections 1291 and 240. The trial court admitted the testimony, after finding that Jasmine was unavailable as a witness and that the prosecution had exercised due diligence in attempting to secure her presence at trial. Carter contends the trial court's admission of Jasmine's preliminary hearing testimony was error and violated his constitutional right to confront witnesses. We reject the contention.

#### **Legal Principles**

"The confrontation clauses of the state and federal Constitutions guarantee defendants the right to confront the witnesses against them. (U.S. Const., 6th Amend.; Cal. Const.,

6

art. 1, § 15.) 'The right of confrontation "seeks 'to ensure that the defendant is able to conduct a "personal examination and cross-examination of the witness." ' " ' [Citation.] Via the confrontation right, a defendant is able to compel prosecution witnesses to appear before the jury so their credibility may be assessed. [Citation.]" (*People v. Wilson* (2021) 11 Cal.5th 259, 289–290 (*Wilson*).)

"Although the constitutional right of confrontation is important, it is not absolute. [Citation.] If a witness is unavailable but had previously testified against the defendant and was subject to cross-examination at that time, that prior testimony may be admitted. [Citations.] Evidence Code section 1291 codifies this exception to the confrontation clauses, stating, 'Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and: [¶] . . . [¶] (2) The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing' (Evid. Code, § 1291, subd. (a)(2).) [The California Supreme Court has] held this exception permits an unavailable witness's preliminary hearing testimony to be admitted at trial. [Citations.]" (*Wilson*, *supra*, 11 Cal.5th at p. 290.)

The United States Supreme Court has held that " ' "[a] witness is not 'unavailable' for purposes of . . . the exception to the confrontation requirement unless the prosecutorial authorities have made a *good-faith effort* to obtain his [or her] presence at trial." ' (*Ohio v. Roberts* (1980) 448 U.S. 56, 74.) California law is in accord. Evidence Code section 240 includes

7

in its definition of unavailability a witness who is '[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process.' (Evid. Code, § 240, subd. (a)(5).)" (*Wilson*, *supra*, 11 Cal.5th at p. 291, fn. omitted.)

"The prosecution must demonstrate that 'the witness is unavailable and, additionally, that it made a "good-faith effort" [citation] or, equivalently, exercised reasonable or due diligence to obtain the witness's presence at trial.' [Citation.] . . . We evaluate whether the prosecution timely searched for the unavailable witness, whether the prosecution 'competently explored' leads on the witness's location, and the overall import of the unavailable witness's testimony. [Citation.] We review de novo the trial court's unavailability determination, although we defer to the trial court's determination of historical facts supported by substantial evidence." (*Wilson*, *supra*, 11 Cal.5th at p. 291.)

**Proceedings**

The trial court held an evidentiary hearing on the admissibility of Jasmine's preliminary hearing testimony on the first day of trial, May 27, 2022, outside of the presence of the jury.

The prosecutor testified that at the beginning of March 2022, she asked Los Angeles Police Department Officer Lisa Frias to make efforts to contact Jasmine.

Officer Frias testified that she began looking for Jasmine to serve her with a subpoena when the prosecutor contacted her.

Prior to that, the officer had not been in contact with Jasmine since the preliminary hearing in 2019.

On March 2, 2022, one of Jasmine's family members informed Officer Frias that Jasmine was working at a Domino's Pizza shop. Officer Frias requested that a patrol from the 77th Division of the Los Angeles Police Department conduct regular, random checks at the Domino's Pizza where Jasmine worked. The officer stayed in contact with the 77th Division, but the patrol did not see Jasmine during its periodic checks.

On March 15, 2022, Officer Frias contacted Jasmine's sister Alyssa, who gave the officer Jasmine's phone number. Officer Frias called the number, but was unable to reach Jasmine.

On March 28, 2022, Officer Frias attempted to call Jasmine to inform her that the trial was going to be delayed because the prosecutor would be trying a different case. A message on the phone stated that it was not accepting calls. That same day, the officer witnessed victim advocate Paola Brass send a text to Jasmine's phone number requesting that Jasmine contact Brass regarding an update on the trial. Brass did not receive a response. Officer Frias confirmed with Alyssa that the phone number she had for Jasmine was correct. Alyssa said that it was, but told the officer she had not seen or spoken to Jasmine in several months. Officer Frias called Jasmine's number multiple times without success.

On May 23, 2022, Officer Frias called Jasmine again. The outgoing message stated that the phone was not in service. In March, Officer Frias had learned from "Melissa M." that Jasmine was living with her mother, so she went to Castillo's residence to try to contact Jasmine in person. The apartment complex where Castillo lived was gated, however, and the officer could not get

9

inside. Officer Frias yelled for someone to let her in but no one responded. She called Castillo three times but got no answer. Officer Frias left a message asking Castillo to return her call, and sent two text messages asking Castillo to contact her regarding the trial and Jasmine, but Castillo did not respond. Officer Frias again confirmed Jasmine's phone number with Alyssa. The officer went to the Domino's Pizza where she was told that Jasmine worked, but did not locate Jasmine there. The officer then checked with three area hospitals to see if Jasmine had been admitted, but she had not. Officer Frias called the morgue, which also had no information regarding Jasmine.

On May 24, 2022, Officer Frias drove to Castillo's apartment complex to search for Jasmine again, but could not enter. The officer called Castillo and left a message asking Castillo to call her back about Jasmine and the trial, but Castillo did not respond. Officer Frias then drove to Domino's Pizza to look for Jasmine. The only employee present told the officer that Jasmine was not there.

On May 26, 2022, Jasmine returned Officer Frias's phone call. Jasmine's call originated from a different number than the one the officer had been given. Jasmine left a voice mail message stating that she no longer wanted to be involved in the case. Jasmine said that she wanted to move on with her life and requested that the video of her not be shown at trial. Jasmine said she knew what she was doing, and that she had lied on the witness stand to get her phone back from her sister. Officer Frias returned the call and Jasmine answered. Officer Frias informed Jasmine that there was a subpoena issued in her name. Jasmine stated that she understood that the case was in trial and that she needed to contact the prosecutor. Jasmine had the prosecutor's

phone number. After that conversation, Officer Frias had no further contact with Jasmine. The officer gave the phone number that Jasmine used to contact her to the prosecutor.

The prosecutor testified that, on May 27, 2022, the date of the hearing, she waited for a call from Jasmine for an hour and a half. Jasmine did not call her, so the prosecutor attempted to call Jasmine. She did not get an answer and was unable to leave a voice mail.

The prosecutor argued that Officer Frias exercised due diligence in attempting to secure Jasmine's presence at trial, but that Jasmine had deliberately absented herself from the proceeding and was unavailable. She further argued that the preliminary hearing transcript was only 17 pages long, so it would not take an undue amount of time to present to the jury.

Defense counsel argued that the search was untimely because Officer Frias had not stayed in contact with Jasmine during the pandemic and only began searching for Jasmine in the three months before trial. Counsel asserted that, although she was the victim, Jasmine's testimony was not very important in light of the fact that there was a video of the offense. The prosecution could have done more to explore reasonable leads, such as contacting the manager at Domino's Pizza or the manager of Castillo's apartment complex. When the prosecutor learned of Jasmine's voice mail she should have understood that Jasmine might not appear voluntarily and made greater efforts to contact her.

The prosecutor emphasized that Jasmine left the voice mail message stating that she did not want to be involved in the case on the night before the hearing, so there was not much time for the prosecutor to act. She believed that, as the victim, Jasmine's

11

testimony was very important—she could testify to her age and the acts committed, and identify Carter in the video.

The trial court found that the prosecution exercised due diligence, and that Jasmine was unavailable as a witness. The court ruled the preliminary hearing testimony was admissible. The court found the pandemic had caused significant delay. Over that time, Jasmine had gone from being a cooperative minor who came to court to being an uncooperative adult who absented herself. It was uncontested that Jasmine had been cross-examined at the preliminary hearing in conformance with the constitutional guarantee of the right to confront witnesses. Jasmine made it very clear that she was not going to be available and did not want to testify. The court had limited power to compel her appearance as a sexual assault victim. The prosecution made reasonable efforts to contact Jasmine, which she thwarted. The prosecution was not required to keep tabs on Jasmine at all times. It had explored reasonable leads. Moreover, Jasmine's testimony was clearly material, as she was the named victim, so admission of the evidence was appropriate.

### Analysis

Carter complains that Detective Frias waited over two years from the preliminary hearing in December of 2019 until March of 2022 to begin her efforts at securing Jasmine's attendance at trial. Carter acknowledges that the Covid-19 pandemic delayed the start of trial, but argues that the detective could have checked in with Jasmine periodically during that time, particularly after the pandemic subsided in 2021. We reject the argument. The law does not place such an obligation on the

prosecution. "The prosecution is not required 'to keep "periodic tabs" on every material witness in a criminal case . . . .' [Citation.] [Nor is it] required, absent knowledge of a 'substantial risk that this important witness would flee,' to 'take adequate preventative measures' to stop the witness from disappearing." (*People v. Wilson* (2005) 36 Cal.4th 309, 342.) Carter asserts that Jasmine was a minor at the time of the preliminary hearing, and that the prosecution should have anticipated that she would absent herself after attaining majority. We are not persuaded. Jasmine appeared and testified at the preliminary hearing. The prosecution had no reason to believe that there was a substantial risk she would flee. The prosecutor acted with due diligence by initiating her attempts to contact Jasmine nearly three months before trial, and continuing her efforts until trial commenced.

Carter argues that Detective Frias should have gained access to Castillo's gated apartment complex using her authority as a police detective and "at least . . . have gotten . . . to [Castillo's] door," or made an effort to contact the management at the apartment complex to gain entry. Carter does not explain why Castillo, who never responded to Officer Frias's telephone calls, would have responded to a knock at her door from someone that she had not let inside the gate. Regardless, "[s]imply because [Carter] suggests [that the detective] could have taken different steps does not mean those [s]he did take lacked diligence." (*Wilson*, *supra*, 11 Cal.5th at p. 293.) Detective Frias spoke with Jasmin's sister who provided the detective with Jasmine's phone number; she had officers routinely check for Jasmine at what was identified as Jasmine's place of employment; she attempted to contact Jasmine's mother; and she attempted to contact Jasmine at her mother's home, where

13

Jasmine was believed to reside. Detective Frias made an effort to find Jasmine over the course of several months, which eventually led to telephone contact with Jasmine in which Jasmine made it clear that she did not intend to testify. Our Supreme Court has explained that "diligence has been found when the prosecution's efforts are timely, reasonably extensive and carried out over a reasonable period[,]" and that cases in which courts have not found adequate diligence are those where the prosecution's efforts "have been perfunctory or obviously negligent." (*People v. Bunyard* (2009) 45 Cal.4th 836, 855–856 (*Bunyard*.)) In *Bunyard*, the court held that efforts similar to those undertaken here constituted due diligence. (*Ibid*. [prosecution demonstrated due diligence by repeatedly seeking the witness out at his last known address, asking for information regarding his whereabouts from acquaintances and relatives, and returning to locations the witness was known to frequent].)

We conclude that the prosecution began its efforts to contact Jasmine in a sufficiently timely manner and followed up on leads regarding her whereabouts with due diligence, but were unable to secure her presence because she absented herself. As the victim, her testimony was important to the prosecution's case. The trial court did not err in finding that Jasmine was an unavailable witness and admitting her preliminary hearing testimony at trial.

### *Admission of Evidence of Prior Sexual Misconduct*

Carter contends that the trial court's admission of evidence of his prior sexual misconduct pursuant to Evidence Code sections 1108 and 352 was an abuse of discretion and a violation

14

of his constitutional right to due process.  Specifically, he challenges the admission of his 1992 convictions for forcible rape and unlawful intercourse with a minor, and Alyssa's testimony that Carter "cat-called" at her when she was a minor.

### Pre-trial hearing

At a pre-trial hearing, the prosecutor sought to admit five prior convictions.  Two of the convictions were for forcible rape and unlawful intercourse with a minor, two for kidnapping of the same victims, and one for sexual battery of one of the victims.  The offenses occurred in 1991.

Defense counsel objected on the ground that in the present case Jasmine consented to the sexual contact, whereas the convictions involved violence.  The convictions were also remote in time.  Counsel argued that evidence of the convictions would confuse the jury and show Carter as violent, rather than as someone with a proclivity for minors.

The prosecutor responded that the victims of the 1992 convictions were minors—12 years old and 17 years old.  The present offense involved uncharged violence; Jasmine reported the incident because Carter became violent with her on the night of the charged offense.  After the offense occurred, Carter stalked Jasmine and came to her house.  Carter's behavior was aggressive in the prior convictions and the current charge.  As to remoteness, Carter was paroled for the prior convictions in 2004, returned to custody for a drug offense in 2006, paroled in 2007, returned to custody for assault with a firearm in 2007, paroled in 2008, and discharged from custody in 2011.  Carter was accused

15

of rape in 2017.  The current offense occurred in 2018.  His criminal activity was continuous.

The trial court ruled that although Carter suffered the convictions in 1992, he engaged in ongoing criminal activity, including an alleged sexual assault.  The 1992 convictions for forcible rape, unlawful intercourse with a minor, and sexual assault were probative and would be admitted.

At the pre-trial hearing, defense counsel also objected to admission of evidence of Carter's conduct toward Alyssa under Evidence Code section 352, arguing that Alyssa's testimony would be more prejudicial than probative.

### **Trial**

At trial, Alyssa testified that when she was 16 years old, Carter "cat-called," at her and gestured for her to come to him on more than one occasion.  Carter was across the street and down the block when these incidents occurred.  Alyssa felt she needed to walk faster.  The prosecution introduced certified records of conviction for forcible rape and unlawful intercourse with a minor.

With respect to the evidence of uncharged sexual offenses, the jury was instructed that it could consider evidence of an offense only if the People proved defendant committed the misconduct by a preponderance of the evidence.  The jury was instructed on the elements of annoying or molesting a child (§ 647.6), rape by force, fear or threats (§ 261, subd. (a)(2)), and unlawful sexual intercourse with a minor (§ 261.5, subd. (a)).

16

### Legal Principles

"As a general rule, 'propensity evidence is not admissible to prove a defendant's conduct on a specific occasion.' (*People v. Jackson* (2016) 1 Cal.5th 269, 299; see Evid. Code, § 1101, subd. (a).) But Evidence Code section 1108, subdivision (a) provides an exception to this rule: 'In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by [s]ection 1101, if the evidence is not inadmissible pursuant to [s]ection 352.' Evidence Code section 352, in turn, provides that '[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' 'In short, if evidence satisfies section 1108, and is not excluded under section 352, admission of that evidence to prove propensity is permitted.' [Citation.] As a reviewing court, we accord deference to a trial court's determination that the probative value of a particular piece of evidence outweighs any danger of prejudice. (See *People v. Miles* (2020) 9 Cal.5th 513, 587, 587–588 [' "[T]he court has broad discretion under Evidence Code section 352" ' and reviewing courts ' " 'will not disturb a trial court's exercise of discretion under Evidence Code section 352 " '*except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner

that resulted in a manifest miscarriage of justice' " ' " '].)" (*People v. Dworak* (2021) 11 Cal.5th 881, 899–900.)

" 'By reason of [Evidence Code] section 1108, trial courts may no longer deem 'propensity' evidence unduly prejudicial per se,' but trial courts 'must engage in a careful weighing process under [Evidence Code] section 352.' (*People v. Falsetta* (1999) 21 Cal.4th 903, 916, 917 (*Falsetta*).) . . . The admissibility of such evidence ' "is entrusted to the sound discretion of the trial judge who is in the best position to evaluate the evidence." ' (*Id.* at pp. 917–918.) [The Supreme Court has] instructed that the trial court's determination should be guided by such factors as the 'nature, relevance, and possible remoteness' of the evidence, 'the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense.' (*Id.* at p. 917.)" (*People v. Dworak, supra*, 11 Cal.5th at p. 900.) " ' " 'As with other forms of relevant evidence that are not subject to any exclusionary principle, *the presumption will be in favor of admission*.' " ' " (*People v. Loy* (2011) 52 Cal.4th 46, 62.)

### Analysis

With respect to the prior convictions, Carter argues that they were remote in time. While this would normally weigh

18

against admission, Carter spent the majority of that time in prison. Under the circumstances, "the timing of the crimes provided no reason to exclude them." (*People v. Loy*, *supra*, 52 Cal.4th at p. 62 [crimes committed 15 and 21 years before charged offense not so remote as to require exclusion where defendant was in prison for much of the intervening time]; accord *People v. Dworak*, *supra*, 11 Cal.5th at p. 901 [no error in admitting 15-year-old rape conviction where defendant was incarcerated for 10 of those years]; *People v. Pierce* (2002) 104 Cal.App.4th 893, 900 [no error in admitting 23-year-old rape conviction where defendant was incarcerated for 12 of those years].) Carter asserts that the crimes he was convicted of between 1992 and the present case were not of a sexual nature. The nature of the crimes does not alter the fact that Carter had little opportunity to commit crimes of a sexual nature while incarcerated. The lack of opportunity outweighs concerns regarding the remoteness of the crimes.

Carter further argues that the prior convictions were for offenses that were more egregious than the present crime. In particular, he asserts that Jasmine consented to the sexual acts that he committed, while one of the 1992 convictions was for forcible rape. The argument lacks merit.

The jury was provided with the fact of each conviction and instructed on the elements that must be found before the defendant could be found to have committed each crime. No further details were presented. With respect to Carter's conviction for unlawful intercourse with a minor, the jury had no reason to believe the offense involved violence or was more egregious than the current crime. The jury was instructed that the crime required sexual intercourse between the defendant,

19

who was at least 21 years old at the time, and the victim, who was under 16 years old, and that the two were not married. The facts in the instant case satisfy the elements of unlawful intercourse with a minor. In fact, the current case is more egregious, as it involved more than one sexual act. Jasmine performed oral sex on Carter in addition to engaging in sexual intercourse with him.

With respect to the forcible rape conviction, the jury was instructed that the intercourse must have been accomplished by one of a number of means, including "force, violence, duress, menace or fear of immediate and unlawful bodily injury to the woman or to someone else." There was no requirement that Carter use physical violence to accomplish the rape to be convicted, and there were no facts presented to the jury in the instant case that suggested he was physically violent in the commission of the prior offense. With respect to the present crime, Jasmine testified at the preliminary hearing that Carter slapped her twice while they were on the bed in the hotel, and that this scared her. Brandan testified that in connection with the video he found of Jasmine and Carter engaging in oral sex, there were messages on Jasmine's phone that were "very derogatory, and they were very threatening." Alyssa testified that in December 2018, before the charged offense took place, she got a telephone call at 3:00 or 4:00 a.m. in which she heard Carter's voice with her sister crying and screaming for help in the background. The evidence in this case supported the inference that Jasmine's participation in the sexual acts with Carter was not consensual and may have been compelled by threats, duress, or physical violence. Although the jury was not required to find that Carter forced or coerced Jasmine to submit to sexual acts,

20

facts were presented that would support such a finding. Nothing compelled the conclusion that the prior rape conviction was more egregious than the current offense.

We conclude that the evidence was highly probative and not unduly prejudicial. The trial court did not abuse its discretion by admitting evidence of the prior convictions.

Alyssa's testimony that Carter cat-called at her when she was 16 years old is also more probative than prejudicial. The testimony demonstrated Carter's sexual proclivity for minors, and was therefore relevant, but it was unlikely to rouse a need in the jury to punish Carter. Distasteful as it may have been, Carter's inappropriate communication with Alyssa was accomplished from a distance and did not result in physical contact between them. Carter's contacts with Alyssa pale in comparison with his lewd acts against Jasmine, and it is highly improbable that the jury was concerned with them in light of the much more serious charge before it. The testimony was probative, but it was not unfairly prejudicial. The trial court did not err in admitting Alyssa's testimony.

Finally, the trial court's admission of evidence of Carter's prior misconduct did not violate his constitutional right to due process. Our Supreme Court has repeatedly rejected that contention because Evidence Code section 1108 preserves the court's discretion to exclude propensity evidence under Evidence Code section 352. (*People v. Dworak*, *supra*, 11 Cal.5th at p. 900.)

### *Prosecutorial Misconduct*

Carter next contends that the prosecutor committed misconduct in cross-examination by asking Carter if other

21

witnesses had lied in their testimony, and then compounded the misconduct by amplifying this line of inquiry in closing argument. We agree with the People that the issue was forfeited because counsel did not object at trial to any of the questions that Carter now challenges, and Carter does not argue that an objection would have been futile or that an admonition would have been ineffective. (*People v. Fayed* (2020) 9 Cal.5th 147, 210.)

Anticipating forfeiture, Carter further contends that counsel provided ineffective assistance by failing to object to the prosecutor's argumentative questions. " 'Generally, a conviction will not be reversed based on a claim of ineffective assistance of counsel unless the defendant establishes *both* of the following: (1) that counsel's representation fell below an objective standard of reasonableness; *and* (2) that there is a reasonable probability that, but for counsel's unprofessional errors, a determination more favorable to defendant would have resulted. [Citations.] If the defendant makes an insufficient showing on either one of these components, the ineffective assistance claim fails.' [Citations.]" (*People v. Foster* (2003) 111 Cal.App.4th 379, 383.)

" 'A defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel,' but the appellate record rarely demonstrates 'that the failure to object was the result of counsel's incompetence; generally, such claims are more appropriately litigated on habeas corpus, which allows for an evidentiary hearing where the reasons for defense counsel's actions or omissions can be explored.' [Citations.]" (*People v. Salcido* (2008) 44 Cal.4th 93, 152.) " '[D]eciding whether to object is inherently

22

tactical, and the failure to object will rarely establish ineffective assistance.' " (*People v. Chatman* (2006) 38 Cal.4th 344, 384.)

Here, the record is silent as to why defense counsel did not object to the alleged misconduct during cross-examination or during closing argument.  Contrary to Carter's assertion, we cannot conclude that the record "affirmatively discloses counsel had no rational tactical purpose" for not objecting.  (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)  Carter's trial counsel may have believed that Carter's responses to the allegedly improper questions were helpful to his defense, or that objecting would have only highlighted the issue for the jury.  Because the appellate record does not demonstrate that counsel was incompetent for not objecting, Carter's ineffective assistance of counsel claim necessarily fails.

### *Denial of* Romero *Motion*

Carter contends that the trial court violated his Fifth Amendment right to due process and his Sixth Amendment right to a jury trial because the court allegedly considered the fact that Carter exercised his right to a jury trial when it denied his motion to strike his prior strike convictions under *Romero*, *supra*, 13 Cal.4th 497.  We reject the contention.

23

## Proceedings

Just prior to trial, defense counsel informed the court that the prosecutor made a plea offer of 14 years in prison, which Carter declined.[3] No counteroffer was conveyed.

After hearing the prosecution's Evidence Code section 1108 evidence, the trial court permitted Carter additional time to speak with his attorney about the plea offer, and observed that the offer was "extremely reasonable" in light of what the court knew about the evidence. The court told Carter that for purposes of the conversation, it was presuming that all of the evidence was true, but that the court had not viewed the video, or heard the testimony of witnesses, or read the preliminary hearing transcript. The court encouraged Carter to "consider the offer of 14 years [because] you are facing life." The court emphasized that if Carter did not wish to take the deal, it was Carter's decision, and the case would proceed to trial in accordance with his wishes.

Later, defense counsel informed the trial court that he advised Carter that in his opinion the People could prove their case beyond a reasonable doubt and that "[Carter] is facing a minimum sentence of 25 years to life in the department of corrections." The court afforded Carter additional time to consider the People's offer. The court informed Carter that the People did not have to keep the offer open once the jurors were present, and advised him that "it would be a legal impossibility for the court to get to that kind of a disposition if you are

---

[3] The record does not include further details of the offer.

24

convicted as charged." Carter again declined the plea offer. The court stated, "So Mr. Carter has made his decision, and I respect that he wants to go forward with his trial despite the overwhelming nature of the evidence, so you will proceed with the trial."

Carter was convicted as charged, and the allegation that he suffered two prior strike convictions was found true. Defense counsel filed a motion to strike one of the prior strikes in the interests of justice under section 1385, arguing that several of the mitigating circumstances to which a court must give great weight were present in this case, including that: Carter suffered childhood trauma connected to his commission of the crime; multiple enhancements were alleged; the combined sentence for the enhancements was greater than 20 years; and Carter's prior convictions were over five years old.[4]

At a hearing on the matter, defense counsel argued that the above factors favored striking one of Carter's strike convictions. Counsel then stated: "The sentencing scheme in this case I wish was different. I wish the case was filed different. The court's options now are a determinate sentence of four to six years at half or 25 years to life. I would just note that that presents quite a difficult challenge for the court and I recognize that. I do wish there was something in the middle. And that is why I urged the case to resolve."

The trial court responded, "Mr. Carter, I am—I whole heartedly agree with what [defense counsel] said in terms of prior discussions and trying to have this case resolved prior to going to a trial. There was a lot of time and effort over multiple occasions,

---

[4] Only a single enhancement was alleged under the Three Strikes law.

even just with this court, for that effort was made on your behalf. And despite all of the discussions with [defense counsel] in private and with the court, you chose this path, which is consistent with your behavior of how you deal with or approach anything that happens in your life."

The court then discussed the factors relevant to Carter's strike convictions—a psychiatric evaluation that concluded Carter suffered from antisocial personality disorder, and Carter's prior convictions, which were remote in time. The court opined that under different circumstances these factors would be more persuasive. In this case, however, the factors in mitigation were outweighed by the danger Carter posed to society. The court noted that Carter demonstrated "over and over again that you are a danger to the community and that your behavior puts other people at risk all the time." The court cited Carter's continued criminal behavior; his choice to take advantage of a position of trust to engage in sexual acts with a 15-year-old child while he was a registered sex offender; the strength of the evidence against Carter—including a video of him engaging in a criminal sexual act with the victim; and the multiple psychiatric evaluations indicating that Carter was at an above-average risk of re-offending. "After reading and considering all of those documents [offered in mitigation] and also taking into consideration the facts that were elicited during the trial", the court concluded that Carter was a danger to society and presented an "above average risk of re-offend[ing] as a sexual predator." The court denied Carter's *Romero* motion and sentenced him to 25 years to life in prison.

**Legal Principles**

Section 1385 permits a trial court to dismiss an enhancement in the furtherance of justice. (§ 1385, subd. (a).) "In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety. 'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others." (§ 1385, subd. (c)(2).) As relevant here, mitigating circumstances include: "[¶] (B) Multiple enhancements are alleged in a single case. . . . [¶] (C) The application of an enhancement could result in a sentence of over 20 years. . . . (D) The current offense is connected to mental illness. [¶] (E) The current offense is connected to prior victimization or childhood trauma. [¶] . . . [¶] [or] (H) The enhancement is based on a prior conviction that is over five years old." (§ 1385, subd. (c)(2).)

A trial court may not penalize a defendant for exercising his right to a jury trial, nor may it promise leniency if a defendant refrains from exercising that right. (*In re Lewallen* (1979) 23 Cal.3d 274, 278–281.) The right to a jury trial in a criminal prosecution is a fundamental right under both the state and federal Constitutions. (*People v. Collins* (2001) 26 Cal.4th 297, 304.) "It is well settled that to punish a person for exercising

27

a constitutional right is 'a due process violation of the most basic sort.' [Citation.]" (*Lewallen*, *supra*, at p. 278.)  A court may not offer any inducement in return for a plea of guilty or treat a defendant more harshly because he or she exercises the right to a jury trial.  (*Id*. at pp. 278–279.)  But, "a trial court's discretion in imposing sentence is in no way limited by the terms of any negotiated pleas or sentences offered the defendant by the prosecution.  The imposition of sentence within the legislatively prescribed limits is exclusively a judicial function.  [Citation.] . . . Legitimate facts may come to the court's attention either through the personal observations of the judge during trial [citation], or through the presentence report by the probation department, to induce the court to impose a sentence in excess of any recommended by the prosecution."  (*Id*. at p. 281, fn. omitted.)

Vindictiveness in sentencing is not presumed from the mere fact the defendant received a harsher sentence after trial than he or she would have received prior to trial upon entry of a guilty plea.  (*People v. Szeto* (1981) 29 Cal.3d 20, 35.)  The defendant has the burden of proving the trial court imposed a harsher sentence as a punishment for his election to go to trial.  (*Ibid*.)

### Analysis

We agree with the People that the trial court's comments to Carter concerning the efforts at plea negotiation were made in response to Carter's attorney's statement, and not part of the court's consideration of Carter's *Romero* motion.  The trial court made clear that the reason it was not affording great weight to the mitigating factors that would militate in favor of striking one

28

of Carter's prior strikes was its conclusion that Carter posed a danger to society and was a "sexual predator," who was likely to reoffend, a conclusion that has ample record support. Carter does not challenge this finding on appeal.

At the time of sentencing, given the crime of conviction, the trial court did not have the authority to sentence Carter to a determinate term of 14 years. The court's options under the sentencing laws were to sentence Carter to a significantly lower term of 4 or 6 years if it dismissed one of the strike convictions as requested, or to impose a term of 25 years to life if it did not. Prior to hearing the evidence, the court deemed the People's offer of 14 years "extremely reasonable." In ruling on Carter's *Romero* motion, however, the court repeatedly emphasized that the evidence presented at trial was overwhelming, at one point stating that "It's probably one of the most impactful, and not in a positive way cases, that I've had to preside over." The court stated that it made its decision based on "all of those documents [offered in mitigation] and also taking into consideration the facts that were elicited during trial[.]" Having determined that Carter was a sexual predator who was likely to re-offend, the court was free to exercise its discretion to decline to give great weight to mitigating factors as a basis to strike one of Carter's prior convictions. (*People v. Lipscomb* (2022) 87 Cal.App.5th 9, 18.) The court did not violate Carter's constitutional rights by imposing a greater sentence than he had been offered prior to trial.

### Conduct Credits

Finally, Carter contends, and the People concede, that the trial court miscalculated his conduct credits.

At sentencing, the court, based on defense counsel's representations, awarded 458 days of presentence custody credit, comprised of 399 days of actual credit for pretrial confinement plus 59 days of conduct credit. In light of the fact that the number of conduct credits awarded was approximately 15 percent of Carter's actual custody credits, the parties posit, and we agree, that the conduct credits were likely calculated pursuant to section 2933.1, which limits conduct credits to 15 percent of custody credits for any person convicted of a felony offense listed under section 667.5. Carter's conviction of violating section 288, subdivision (c) is not among the crimes listed. It appears that Carter's conduct credits should instead have been calculated pursuant to section 4019, which governs conduct credits generally. Doing so requires the trial court to determine whether "it appears by the record that the prisoner has not satisfactorily complied with the reasonable rules and regulations established by the sheriff, chief of police, or superintendent of an industrial farm or road camp," which could reduce the conduct credits awarded. (§ 4019, subd. (c).)

The People assert that, because there may be a factual dispute as to how many credits should be awarded and because Carter failed to file a motion in the trial court seeking relief, we should dismiss the claim. Although the People do not explicitly state the basis for dismissal, we presume that the authority upon which the People rely is section 1237.1. The statute provides in

30

pertinent part: "No appeal shall be taken by the defendant from a judgment of conviction on the ground of an error in the calculation of presentence custody credits, unless the defendant first presents the claim in the trial court at the time of sentencing, or if the error is not discovered until after sentencing, the defendant first makes a motion for correction of the record in the trial court, which may be made informally in writing." (§ 1237.1.) Section 1237.1 requires dismissal when the sole issue raised on appeal involves an issue of presentence custody credits; however, where, as in the present case, there are other issues presented on appeal, we may consider the matter in the interests of judicial economy. (*People v. Acosta* (1996) 48 Cal.App.4th 411, 426–428.) We therefore decline to dismiss the claim, and we remand the matter to the trial court for the limited purpose of making any necessary factual determinations and recalculating Carter's conduct credits under section 4019.

## DISPOSITION

We remand the matter to the trial court for the limited purpose of recalculating Carter's conduct credits. In all other respects the judgment is affirmed.

NOT TO BE PUBLISHED.


MOOR, J.

We concur:


BAKER, Acting P. J.                    KIM, J.


31