Filed 9/4/25  P. v. Gifford CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| THE PEOPLE, | C101103 |
| Plaintiff and Respondent, | (Super. Ct. No. 62-186420) |
| v. | |
| ROBIN GIFFORD, | |
| Defendant and Appellant. | |

Defendant Robin Gifford appeals from a jury verdict finding her guilty of (1) theft from an elder or dependent adult and (2) identity theft.  Her primary argument is that the prosecutor committed misconduct during direct examination and closing argument by highlighting the fact that law enforcement obtained her bank records pursuant to a search warrant.  She claims this implied she had a duty to provide those records to law enforcement during their investigation, which, in turn, constituted improper burden shifting.  Because her counsel failed to object to the alleged misconduct, she also makes an ineffective assistance of counsel argument.  Finally, she argues the court erred in admitting evidence of a prior misdemeanor welfare fraud conviction.  We find she forfeited the first argument, and we reject the other two and thus affirm.

1

# FACTUAL BACKGROUND

At the time of trial, the victim in this case, Paul R.,[1] was 82 years old and living in a memory care facility. In January 2020, he was 78, he did not have a wife or children, and he lived alone. Friends had started noticing he was having memory issues, was repeating things, and was exhibiting "odd behavior."

Robert Kennedy had known Paul since 2011. They were "friends" and got together often. He met Gifford, who was one of Paul's neighbors, sometime around 2015 or 2016. Gifford and Paul both told Kennedy that Gifford helped Paul with things like cleaning and laundry.

When COVID-19 hit in March 2020, Kennedy stopped visiting Paul, although he occasionally spoke to him on the phone. He also occasionally spoke to Gifford during this time, and she indicated she was still helping Paul with cleaning and laundry. At some point, Kennedy and Gifford discussed their mutual concern about Paul "possibly having dementia."

Kennedy testified that in or around April 2022, Gifford called and said she was worried because Paul had firearms in his home, and she asked Kennedy to come lock them up or take them away. Kennedy went over to Paul's house for the first time since COVID-19 had hit and was "shocked at the state of the place." He testified, "the house had become significantly more cluttered . . . and more disheveled than it was when I was there previously, and I wasn't happy about it." Gifford was present during this visit.

Kennedy then arranged to visit Paul on his own, without Gifford present, because he "wanted to spend more time trying to find out what the situation was at his house." He and Paul went through the mail and found a notice that indicated Paul's house was facing foreclosure. He and Paul also accessed Paul's bank accounts online, and "that's

---

[1] To protect his privacy, we refer to the victim by first name and last initial only. (Cal. Rules of Court, rule 8.90.)

when we discovered what was going on." According to Kennedy, Paul had very little money in his account. Kennedy "didn't know the exact amount that Paul received on a monthly basis," but he "knew that it wasn't a small amount" and there should have been more money in the account. Kennedy also testified that ATM withdrawals were being made at casinos, even though, as far as he knew, Paul did not gamble. At that point, Kennedy contacted law enforcement. He suspected Gifford had Paul's bank card and the keys to his house, and he instructed her to return them. She left them in an envelope next to a street sign near Paul's house.

Several months later, while he was helping Paul move out of his house and into an assisted living facility, Kennedy found a jury summons addressed to Paul stating he was summoned for jury service the week of January 13, 2020. Attached to the summons was a request to be excused from jury service due to a "mental impairment" that was signed "under penalty of perjury" by Gifford, who was identified as "friend." Next to these documents was a "fax log" suggesting the request had been faxed to the court on January 10, 2020.

Detective Cameron Bal was assigned to investigate allegations that Gifford had stolen money from Paul. In June 2022, he and Detective Albonetti interviewed Gifford at her home (the interview was recorded and transcribed, and both the record and transcript were admitted into evidence). The detectives told Gifford that Paul reported she had used his ATM card at some casinos without his permission. Gifford told the detectives she had permission to use Paul's card to purchase things for him because "he had no way to get to a store." She also told them she sometimes used her own card to buy him things, and then reimbursed herself. When asked why she did not just use his card to buy him things "as opposed to using your own card," she responded, "Because I was buying for myself also." She estimated she spent $70 to $80 on him every other day, and she stated, "I have . . . proof on my cards that I was at grocery stores buying things for him." The detectives asked her about "gambling" and withdrawing funds from Paul's account at casinos, and

3

she said she "was reimbursing" herself for what she had spent on him. When asked if she had a gambling problem, she responded, "yeah, I have in the past," and she said she had dealt with it by "call[ing] the gambling anonymous type thing." Gifford also told detectives Paul "has dementia," and she had been "taking care" of him since right before COVID-19 started. When asked when the dementia started, she responded, "Probably four to five years ago. [¶] . . . [¶] We all started noticing it. The neighborhood people started noticing it. Um, he, he was just clueless."

On direct examination, Detective Bal testified Gifford never provided him with bank statements or receipts for the purchases she allegedly made for Paul. On cross-examination, he testified he never asked her for bank statements or receipts.

Justin Infante, an investigator with the district attorney's office, conducted a "forensic audit" based on his review of Paul's bank records, Gifford's bank records, and other documents, and he created several spreadsheets summarizing the results of his audit. The audit showed that, between January 2020 and February 2022, 148 checks were written from Paul's bank account to Gifford, totaling over $76,000 (and, as will be noted below, Gifford testified she wrote these checks). To give one example, in July 2021, 14 checks were written to Gifford—for $700, $500, $950, $600, $754, $1,111, $854, $650, $1,100, $500, $1,100, $400, $500, and $600—totaling $10,319.

Infante's audit also showed that, between May 2021 and April 2022, over $45,000 was withdrawn from Paul's bank account using ATMs located at various casinos. Infante reviewed casino records that showed when Gifford's "players card" was "active," and he confirmed her card was active at the time these ATM transactions occurred.[2] For

---

[2]    A players card "is a card that keeps track of play giving you points based on the time and amount bet [or] played on a table or amount spent at a slot machine." These points can be used for "free plays" and discounts at the casino. A players card can be inserted into a slot machine or "registered" at a card table, and casinos keep records

example, on August 7, 2021, Paul's ATM card was used at Thunder Valley Casino to make a balance inquiry (there was over $3,000 in his account at the time), and then to withdraw $304, $204, and $124; the next day, it was used to withdraw $144 and $204 at Thunder Valley Casino. Thunder Valley Casino records show Gifford's players card was active on both dates. As another example, on August 23, 2021, Paul's ATM card was used at Thunder Valley Casino to make a balance inquiry (his account was overdrawn by $42.38 at the time) and to withdraw $404 (and this withdrawal caused Paul to incur a $35 overdraft fee). Thunder Valley Casino records show Gifford's players card was active on that date.

Infante also tracked withdrawals from Gifford's bank account for groceries and gas. He explained that he went through her bank statements and identified "any type of transaction that occurred at a grocery store or any other food place . . . . I also did the same with any transactions at gas stations." When asked why he did so, he responded, "Well, per her statement to the . . . detectives that interviewed her, she estimated she spent $7[0] to $80 every other day buying items for [Paul]. This is my way [of] giving her the benefit of the doubt to track how much she was spending or could possibly be spending on food or gas for [Paul]." Infante's review found that, between May 2021 and April 2022, Gifford spent $5,837 on groceries and gas from her account, and during that same time period Paul's ATM card was used to withdraw over $45,000 at various casinos and checks totaling over $35,000 were written from Paul's account to Gifford.

---

showing when players cards are active. Gifford had a players card at Thunder Valley Casino and Hard Rock Casino.

Infante testified that, as far as he knew, Gifford only had one bank account—at Safe Credit Union—and the only records he reviewed were from that account.[3] He had never spoken with Gifford and thus never asked her if she had another bank account.

Sandra Myers is a friend and former neighbor of both Gifford and Paul. She testified on Gifford's behalf. She believed Gifford was "a truthful person" and would not steal from anybody. She had seen Gifford pay for Paul's meals on more than one occasion, including one time where Gifford used Paul's ATM card to pay for the meal. She personally observed Gifford tell Paul he needed to reimburse her for things, and Paul responded, "I will." On cross examination she was told Gifford was alleged to have taken $121,000 from Paul, and she testified that did not surprise her "given . . . all the work that Robin did for Paul." She stated Gifford cleaned Paul's house, bought him groceries, took him to doctor's appointments, and drove him places. She also testified she had discussions with Gifford and Paul about the fact that Paul "was supposed to compensate her for doing all the work she did."

Gifford testified in her own defense. She had known Paul since 2006 and became his neighbor in 2007. By January 2020, she "had noticed a lot of deterioration in his mental state" and "some slipping going on." She acknowledged she signed the form to get Paul excused from jury service in January 2020, and that when she did so, she believed he had a mental impairment that prevented him from serving on a jury.

Gifford testified she started taking care of Paul in early 2020. She helped him with cleaning, grocery shopping, doctor's appointments, and other errands. She estimated she spent 30 hours a week helping him. She testified Paul agreed to pay her "a minimum of $2,500 a month" for her help based on "a 30-hour week," and "[i]t could go higher if I spent more hours." Paul also agreed she could reimburse herself for

---

[3] He identified the Safe Credit Union account by reviewing Paul's bank records, which showed the checks written to Gifford were deposited into that account.

expenditures she made on his behalf. She testified Paul gave her his ATM card and told her she could use it. She also had access to Paul's checkbook and would reimburse herself by writing checks from it. She acknowledged she wrote approximately $76,000 in checks to herself using Paul's checkbook, and she testified it was all for reimbursement or to pay her for her time. She kept a tally of how much money Paul owed her on scrap pieces of paper, but she no longer had those pieces of papers and she could not say what any particular check was for. She testified that whenever she used Paul's ATM card to withdrew money at a casino, she believed that was her money because "[t]here was an agreement with Paul [ ] that I would make so much each month because I was spending so much time with him." She acknowledged she considered herself a gambling addict.

Gifford testified she never saw Paul's bank statements and does not remember ever seeing that his account was overdrawn. She had seen foreclosure notices in the mail and she knew he was not paying his bills because she saw past due notices.

During the relevant time period, Gifford had two bank accounts: a Safe Credit Union account, and a "GoBank" account. She testified the GoBank account was her primary account. No one from law enforcement ever asked her for information about her bank accounts, and if she had been asked, she would have told them about her GoBank account. She testified she purchased things for Paul on both accounts.

## DISCUSSION

### I

### Prosecutorial Misconduct

Gifford argues the prosecutor committed two instances of misconduct—first during the direct examination of Infante, and then during closing argument. We find she forfeited the first claim by failing to object and she forfeited the second claim by failing to request an admonition.

## A. Additional relevant facts

Gifford complains about the following exchange during Infante's direct examination: "Q: The records that you reviewed with regards to Ms. Gifford's bank records, those were obtained pursuant to a search warrant, right? [¶] A: They were. [¶] Q: Were you at all provided with any other records by the defendant or anyone else that were her bank records? [¶] A: No, I was not." No objection was made.

She also complains about the following statement made during closing argument: "You heard that Investigator Infante wrote search warrants then he went to get bank records. She didn't provide that proof to law enforcement. She didn't provide them with the bank statements. We had to go get them. They were obtained with the use of a search warrant." No objection was made at that time. Later, the prosecutor also argued Infante "was never provided with any Go accounts or any other bank records. But he went looking and found $5,800 worth of transactions." At that point, defense counsel asked to approach the bench and a discussion took place off the record. Outside the presence of the jury, the court described this off-the-record discussion as follows: "There was an objection during the initial argument of the People raised by the defense. There was a request to approach the bench. The parties did approach. [¶] The issue had to do with . . . the People in the argument referring to the failure of the defendant to produce documents at the investigating stage of this investigation. [¶] And the Court did believe that that was beyond what would be allowed to be argued. And I think the parties then just went on without touching on that issue again through the argument." Based on the court's description of the off-the-record discussion, it appears that defense counsel objected to the prosecutor's reference to Gifford's failure to produce her bank statements during the investigation, and that the court sustained the objection (i.e., "the Court did believe that that was beyond what would be allowed to be argued"). It also appears, however, that no request for an admonition was made, and no admonition was given.

*B.     Analysis*

Gifford argues the questions to Infante and the argument cited above constituted misconduct because they implied a search warrant was necessary to obtain Gifford's bank records because she did not consent to their release, which in turn implied she had a duty to produce her bank records during the investigation stage, which improperly shifted the burden of proof to her. Or as she puts it: "Referencing the necessity of a search warrant was signaling to the jury that there was a lack of consent by [Gifford] and that consent would be expected from an innocent person."

We need not address the merits of whether misconduct occurred, as we conclude Gifford's challenges to the line of questioning and the prosecutor's comments in closing argument are forfeited for the reasons explained below.

"To preserve . . . a claim [of prosecutorial misconduct] for appeal, 'a criminal defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the impropriety. [Citations.]' [Citation.] The failure to timely object and request an admonition will be excused if doing either would have been futile, or if an admonition would not have cured the harm." (*People v. Clark* (2011) 52 Cal.4th 856, 960; see also *People v. Jackson* (2016) 1 Cal.5th 269, 367 ["A defendant's 'failure to object and request an admonition waives a misconduct claim on appeal unless an objection would have been futile or an admonition ineffective' "].) " 'The reason for this rule, of course, is that "the trial court should be given an opportunity to correct the abuse and thus, if possible, prevent by suitable instructions the harmful effect upon the minds of the jury." ' " (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1341.)

Gifford acknowledges no objection was made to the prosecutor's questions to Infante, and she makes no attempt to argue an objection would have been futile. She has thus forfeited appellate review of her first alleged instance of misconduct (and we will discuss her argument that her attorney's failure to object constituted ineffective assistance of counsel in the next section).

9

That leaves the second alleged instance of misconduct—i.e., the statements during closing argument (1) that Gifford did not provide her bank records to law enforcement and Infante "had to go get them" "with the use of a search warrant," and (2) that Infante "was never provided with any Go accounts or any other bank records." We will give Gifford the benefit of the doubt and assume her counsel objected to both statements during the off-the-record discussion with the court, and the court sustained the objection. (See, e.g., *People v. Peoples* (2016) 62 Cal.4th 718, 801 ["a claim of prosecutorial misconduct during cross-examination was preserved despite defense counsel's failure to object at trial, where the next question from the prosecutor triggered an objection and extended colloquy between judge and both counsel"].) She acknowledges, however, that her counsel did not request that the jury be admonished to disregard the statements. Again, to preserve her misconduct claim for appeal, she had to both object, *and* "ask the trial court to admonish the jury to disregard the impropriety." (*People v. Clark, supra*, 52 Cal.4th at p. 960.) She also acknowledges that, if counsel had asked the trial court to admonish the jury, it likely would have done so, and she does not suggest an admonishment would have been ineffective. She has thus forfeited appellate review of her second misconduct claim as well.

II

Ineffective Assistance of Counsel

Anticipating our conclusion that she has forfeited her misconduct claims, Gifford argues her attorney's failure to object or request an admonishment constituted ineffective assistance of counsel. We disagree.

" 'A defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 674.) In order to prevail on an ineffective assistance claim, Gifford "bears the burden of showing by a preponderance of the evidence that (1) counsel's

10

performance was deficient because it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficiencies resulted in prejudice." (*Ibid*.)  If Gifford " 'makes an insufficient showing on *either* one of these components, [her] ineffective assistance claim fails.' " (*People v. Foster* (2003) 111 Cal.App.4th 379, 383, italics added.)

" '[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . .  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.' " (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1241.)  In order to show prejudice, Gifford must establish there is a " 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " (*People v. Centeno, supra*, 60 Cal.4th at p. 676.)  Prejudice will not be presumed and "must be affirmatively proved.  [Citations.]  'It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. . . .  The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.]  Specifically, 'When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.' " (*People v. Ledesma* (1987) 43 Cal.3d 171, 217-218.)  Here, we conclude Gifford has not established prejudice, and we thus do not need to determine whether her counsel's failure to object or request an admonition was deficient.  We address Gifford's specific claims below.

A.    *Direct examination of Infante*

Again, Gifford complains that the prosecutor asked Infante (1) whether Gifford's bank records "were obtained pursuant to a search warrant," and (2) whether he was

"provided with any other records by the defendant . . . that were her bank records." Gifford argues (accurately) that, during the investigatory stage (which is the stage at which Infante obtained the records), she had no duty to provide any evidence to law enforcement. (See, e.g., *People v. Garcia* (2017) 2 Cal.5th 792, 816, [individual has right guaranteed by the Fifth Amend. not to be compelled to produce evidence which could later be used against him or her in a criminal action].) She then argues these two questions implied she "was hiding records that she had a duty to produce," which constituted "impermissible burden shifting." Viewing the evidence as a whole, we do not find the challenged questions implied she was hiding records she had a duty to produce or otherwise resulted in prejudice.

Detective Bal testified he never asked Gifford for her bank records. And Infante testified he never spoke with Gifford and thus never asked her for her bank records. Finally, Gifford testified no one from law enforcement asked her about her bank records, and if they had, she would have told them about her GoBank account. Because all witnesses agreed law enforcement never asked Gifford for her bank records, we do not find it reasonably probable the jury would have drawn an adverse inference from the fact she did not provide them to law enforcement.

As for the reference to obtaining Gifford's bank records pursuant to a search warrant, we find that also did not result in prejudice, particularly where, as here, there was evidence that *Paul's* bank records were also obtained pursuant to a search warrant.

The first witness to testify at trial was an employee of Wells Fargo (which was Paul's bank) who explained how bank statements and debit cards worked. She was asked whether she reviewed "bank records pursuant to a search warrant for the records of Paul," and she responded, "Yes." No objection was made, and Gifford does not argue on appeal that this question was improper.

Later, Infante testified about the records he reviewed as part of his investigation and audit. He was first asked, "Did you obtain the victim's bank statements, Paul [ ]'s

12

bank statements, through a search warrant," and he responded, "I did." Shortly thereafter, he was asked, "Did you also write a search warrant for the defendant's bank records," and he once again responded, "I did." Again, no objection was made and Gifford does not suggest either question was improper.

Later, when Infante was testifying about the spreadsheets he created to summarize the results of his investigation and audit, he again referenced the fact that both Paul's and Gifford's bank records were obtained pursuant to a search warrant. One of the spreadsheets showed the ending balance, total deposits, and total withdrawals from Paul's bank account from January 2020 through December 2022 by month, and Infante was asked about one entry from January 2020 that stated "no data":

"Q: In this first column [of Exhibit No. 21] it says no data, what does that mean? [¶] A: . . . [I]t didn't fall within the confines of the search warrant, so that data was not provided to us . . . ."

Another spreadsheet showed the same information regarding Gifford's bank account. The entries from January 2020 through May 2021, and from July 2022 through December 2022 stated, "no data," and Infante was asked the following:

"Q: And pursuant to your search warrant, you didn't receive any records from 2020, right? [¶] A: I did not. [¶] Q: The records that you did receive were from June of 2021 through June of 2022? [¶] A: That's correct." Again, no objection was made, and Gifford does not complain about these questions on appeal.

Considering all of the prosecutor's questions about how Infante obtained both Paul's and Gifford's bank records, the only implication that appears to us is that law enforcement uses search warrants to obtain bank records, and Gifford fails to convince us counsel's failure to object to one question about obtaining her records pursuant to a search warrant resulted in prejudice.

13

*B.     Closing argument*

In closing argument, the prosecutor implied a search warrant was necessary to obtain Gifford's bank records because Gifford did not provide them to law enforcement during its investigation: "You heard that Investigator Infante wrote search warrants then he went to get bank records. She didn't provide that proof to law enforcement. She didn't provide them with the bank statements. We had to go get them. They were obtained with the use of a search warrant." And again: "He [i.e., Infante] was never provided with any Go accounts or any other bank records." This, in turn, may have implied that Gifford had an obligation to provide her bank records to law enforcement at the investigatory stage.

When analyzing the prejudicial effect of closing argument on the jury, we are mindful that "the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements." (*People v. Frye* (1998) 18 Cal.4th 894, 970, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) " ' " '[T]he question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " ' " (*People v. Jackson, supra*, 1 Cal.5th at p. 349.) Again, Gifford fails to show prejudice.

In addition to the prejudice analysis discussed above, we note the jury was instructed, "A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defense guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt." (CALCRIM No. 220.) The jury was also instructed the People had to prove each element of the charged crimes, including lack of consent. Finally, the jury was instructed, "Neither side is required to call all witnesses who may have information about the case or

14

to produce all physical evidence that might be relevant." (CALCRIM No. 300.) The jury was thus instructed (1) the People had the burden of proving Gifford was guilty, and (2) Gifford was not required to produce evidence. We presume the jury followed those instructions. (See *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 196 ["The jury is presumed to have followed the trial court's instructions in the absence of any indication it was unwilling or unable to do so"]; *People v. Bennett* (2009) 45 Cal.4th 577, 596 ["the jury was instructed that the prosecution bears the burden of proof. We presume the jury followed the instructions it was given"].)

Moreover, after the prosecutor made the challenged comments about needing a search warrant to obtain the records, she then reminded the jury that she had the burden of proving Gifford was guilty beyond a reasonable doubt. Defense counsel also reiterated this: "[I]t is not Ms. Gifford's job to bring the proof forward. It is the district attorney's job to bring the proof forward." And again: "It's the People's job to find this evidence." And defense counsel emphasized that the detectives who interviewed Gifford never asked her about her bank accounts or her bank statements. Given both the jury instructions and the entirety of the closing arguments, we do not find it is reasonably probable the jury "drew the most damaging rather than the least damaging meaning from the prosecutor's statements." (*People v. Frye, supra*, 18 Cal.4th at p. 970.)

Moreover, and regardless of how Gifford's Safe Credit Union records were obtained (i.e., whether pursuant to a search warrant or because she provided them to law enforcement), those records were admitted without objection, and Gifford does not suggest they should not have been admitted. Those records were inculpatory not because they were obtained pursuant to a search warrant, but because they tended to disprove Gifford's testimony that she was only reimbursing herself for money she had spent on Paul. In other words, their value lay not in how they were obtained, but in what they showed.

15

Given all this, Gifford fails to convince us there is a reasonable probability a more favorable outcome would have resulted if the prosecutor had not stated during closing argument that Infante had to obtain Gifford's bank records pursuant to a search warrant because she did not provide them to law enforcement.

III

Gifford's Prior Conviction

Gifford's final argument is that the trial court erred in allowing evidence of her prior conviction for welfare fraud to be admitted for impeachment purposes. We disagree.

A.    *Additional relevant facts*

In 2018, Gifford pled no contest to misdemeanor welfare fraud. The charge was based on her failure to report her son's income while he was living with her, which resulted in her receiving over $5,000 in benefits in 2015 and/or 2016 to which she was not entitled. At the time of the plea, Gifford had paid restitution in full, and several months after the plea, the court granted her motion to expunge the conviction.

Gifford filed a motion in limine to exclude evidence of her prior conviction pursuant to Evidence Code section 352, and the prosecution filed a motion in limine to admit it for impeachment purposes if Gifford testified. At the hearing on the motion, defense counsel argued "the big issue" was that the conviction and the underlying conduct were "remote in time." He also noted the conviction was quickly expunged and argued it thus "should not be held against her." He confirmed Gifford intended to testify. The prosecutor responded the conviction was based on misstatements Gifford made on her application for benefits, which was "extremely relevant to her credibility when she testifies."

The trial court ruled the prior conviction could be used for impeachment purposes if Gifford testified. It explained, "The Court does not think this is remote. While it's alleged to have occurred back in 2015 and 2016, the conviction itself was not until 2018.

16

So it's just a little over five years old in terms of the conviction, and certainly within ten years in terms of the conduct." It also explained, "it's not identical to the current charge. It is explainable, and she may very well be able to explain it as being something that was not something that would detract from her reputation for honesty or dishonesty. But, again, I think that's ultimately a jury question."

### B. Relevant law and standard of review

Evidence of a defendant's prior conviction is relevant and admissible for impeachment purposes if it reflects adversely on the defendant's honesty, subject to the limitations of Evidence Code section 352. (See *People v. Robinson* (2011) 199 Cal.App.4th 707, 712.) Evidence Code section 352 provides, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." In exercising its discretion whether to exclude evidence of a prior conviction, the trial court should consider four factors: "(1) whether the prior conviction reflects adversely on an individual's honesty or veracity; (2) the nearness or remoteness in time of a prior conviction; (3) whether the prior conviction is for the same or substantially similar conduct to the charged offense; and (4) what the effect will be if the defendant does not testify out of fear of being prejudiced because of the impeachment by prior convictions." (*People v. Mendoza* (2000) 78 Cal.App.4th 918, 925.) "We review the trial court's ruling under Evidence Code section 352 for abuse of discretion." (*People v. Watson* (2008) 43 Cal.4th 652, 684.)

### C. Analysis

As to the first factor, we easily find Gifford's prior conviction for welfare fraud reflects adversely on her honesty or veracity, and she does not seriously suggest otherwise. " '[A]cts of deceit, fraud, [or] cheating . . . are universally regarded as conduct which reflect adversely on a man's honesty and integrity.' " (*People v. Beagle*

17

(1972) 6 Cal.3d 441, 453.)  A conviction for welfare fraud is thus "clearly probative on the issue of [the defendant's] credibility." (*People v. Mendoza, supra*, 78 Cal.App.4th at p. 925; see also *Beagle*, at p. 453 [" 'convictions which rest on dishonest conduct relate to credibility' "].)  This is particularly true where, as here, Gifford acknowledges that "this case turned on [her] credibility."  Where "defendant's line of defense at trial" puts her credibility "directly at issue," "this factor would *not* favor the exclusion of the prior." (*Mendoza*, at p. 925, italics added.)

Gifford argues the prior conviction was "relatively remote."  The trial court found otherwise, and we find no abuse of discretion.  Although the remoteness of the prior conduct "is an appropriate factor to consider in a[n Evidence Code] section 352 analysis," "there is no bright-line rule" defining how remote is too remote. (*People v. Harris* (1998) 60 Cal.App.4th 727, 739.)  Here, Gifford was convicted in 2018 based on conduct that occurred in 2015 or 2016, and the trial in this case was held in 2024.  This is not too remote to be admissible under Evidence Code section 352. (See *People v. Muldrow* (1988) 202 Cal.App.3d 636, 647-648 [priors that were 10 to 20 years old not too remote].)

Finally, Gifford argues the prior conviction should have been excluded because it was "too similar" to the charged offense.  Where the prior conviction " 'is for the same or substantially similar conduct for which the accused is on trial,' " there may be " 'strong reasons' " for excluding it " 'because of the inevitable pressure on lay jurors to believe "if he did it before he probably did it this time." ' " (*People v. Beagle, supra*, 6 Cal.3d at p. 453.)  However, "the identity of the offense charged and impeaching prior convictions does not dictate exclusion.  The identity or similarity of current and impeaching offenses is just one factor to be considered by the trial court in exercising its discretion." (*People v. Castro* (1986) 186 Cal.App.3d 1211, 1216.)  The trial court considered this factor and found the prior conviction was "not identical" to the current charge, and we agree.  The prior conviction was based on making a false statement about household income on an

application for food stamps, and the current charges are based on taking money from the victim by writing checks on his account and using his ATM card without his consent.

In sum, we find no abuse of discretion in admitting evidence of Gifford's prior conviction for impeachment purposes.

## IV

## Cumulative Error

Finally, Gifford argues that even if her claims of prosecutorial misconduct, ineffective assistance of counsel, and admitting evidence of her prior conviction are not individually prejudicial, they are cumulatively prejudicial. We disagree. "Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial." (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.) "In examining a claim of cumulative error, the critical question is whether defendant received due process and a fair trial." (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1068.) Having examined the entire record, we are satisfied Gifford received a fair trial.

## DISPOSITION

The judgment is affirmed.

/s/
_____
EARL, P. J.

We concur:


/s/
_____
ROBIE, J.


/s/
_____
WISEMAN, J.*

_____

\*      Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

19